### In re UNIFIED COMMERCIAL CAPITAL, INC., Debtor.

### Douglas J. Lustig, as Trustee, Plaintiff,

### v.

### Weisz and Associates, Inc., and Frank B. Weisz, Defendants.

**Bankruptcy No. 98–23908.**
**Adversary No. 00–2206.**

United States Bankruptcy Court, W.D. New York.

March 29, 2001.

---

**10.** Docket no. 17.

**11.** Docket no. 16.

David H. Ealy, Shapiro, Rosenbaum, Liebschutz & Nelson, LLP, Rochester, for Plaintiff.

Stephen E. LaPrade, Phillips, Lytle, Hitchcock, Blaine & Huber, Rochester, for Defendants.

### DECISION & ORDER

JOHN C. NINFO, II, Chief Judge.

#### BACKGROUND

In August 1998, Samuel A. Yacono ("Yacono"), under investigation by the United States Securities and Exchange Commission (the "Commission"), committed suicide. Prior to his death, Yacono was the sole and/or controlling shareholder of a number of corporations (the "Yacono Controlled Entities"), including First American Reliance, Inc. ("First American"), Money Managers, Inc. ("Money Managers"), Unified Commercial Capital, Inc. ("Unified Commercial") and American Freedom Securities, Inc. ("American Freedom"). In connection with a Civil Injunctive Action commenced by the Commission in the United States District Court for the Western District of New York (the "District Court"), the District Court appointed a temporary receiver (the "Receiver") for the Yacono Controlled Entities who was directed to file Chapter 7 cases for each of the companies. After a Chapter 7 case was filed by Unified Commercial on October 16, 1998, Douglas J. Lustig, Esq. (the "Trustee") was appointed as its Trustee.

In various proceedings in the District Court and this Bankruptcy Court (the "Court"), the Trustee has asserted that Yacono and the Yacono Controlled Entities were engaged in a "Ponzi" scheme. However, no evidentiary hearing or trial has been conducted by the District Court or this Court to determine whether Yacono and the Yacono Controlled Entities were in fact engaged in a "Ponzi" scheme.[1]

On October 14, 2000, the Trustee commenced an Adversary Proceeding against Weisz and Associates, Inc. ("Associates") and Frank B. Weisz ("Weisz"), its principal. The Complaint in the Adversary Proceeding alleged that: (1) Unified Commercial was engaged in the apparent business of selling "debentures" and "certificates of deposits" to investors promising "guaranteed" returns of twelve percent (12%) per annum or more and "safety of principal"; (2) in fact, Unified Commercial was engaged in a "Ponzi" scheme; (3) because the return on the loans and investments that Unified Commercial made with the funds which it received from its investors was never sufficient to repay its obligations to those investors, Unified Commercial satisfied its obligations to its investors by using funds obtained from new investors; (4) by 1997, Unified Commercial

---

1. A "Ponzi" scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attracts additional investors. *Merrill v. Abbott (In re Indep. Clearing House Co.),* 41 B.R. 985, 994 n. 12 (Bankr.D.Utah.1984) (citation omitted).

**346**

was insolvent; (5) Associates and Weisz invested $100,000.00 with Unified Commercial which repaid them their principal investment plus interest at twelve percent (12%) per annum in the amount of $11,926.32 (the "Interest"); (6) Unified Commercial received less than reasonably equivalent value and no fair consideration in exchange for its payment of the Interest; and (7) the installment payments of the Interest made by Uniform Commercial were avoidable fraudulent transfers because: (a) they were made with the actual intent to hinder, delay and defraud creditors of Unified Commercial; (b) Unified Commercial received less than reasonably equivalent value and no fair consideration in exchange for the installment payments; (c) at the time of each of the installment payments Unified Commercial: (i) was insolvent; (ii) was engaged in a business or transaction for which its remaining property consisted of unreasonably small capital; and (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to repay as they matured; and (d) the Trustee could prove each of the other elements necessary for the Court to determine that the installment payments of the Interest were avoidable fraudulent transfers pursuant to Sections 544(b)(1), 548(a) and 550(a) of the Bankruptcy Code and Sections 273, 274, 275 and 276 of Article 10 of the New York Debtor and Creditor Law (the "DCL").

On November 2, 2000, Associates and Weisz filed a Rule 12(b)(6) Motion to Dismiss the Adversary Proceeding (the "Dismissal Motion") which alleged that: (1) before Associates and Weisz invested $100,000.00 with Unified Commercial they had received an Offering Circular and Subscription Agreement, utilized in connection with the sale of debentures, which indicated that Unified Commercial was formed in October 1996 to engage in accounts receivable acquisitions, business finance and purchase order funding; (2) Associates and Weisz invested $100,000.00 with Unified Commercial on or about February 24, 1997, and on or about February 24, 1998, after Associates had received periodic contractual payments of interest, Associates was repaid its original investment together with a final payment of contractual interest; (3) Associates and Weisz made their investment with Unified Commercial in good faith, and without knowledge of the "Ponzi" scheme alleged by the Trustee; (4) in connection with the Trustee's constructive fraud causes of action under Section 548(a)(1)(B)(i), Unified Commercial received reasonably equivalent value in exchange for the payment of the Interest because: (a) value for purposes of Section 548(a), as set forth in Section 548(d)(2)(A),[2] includes a transfer in satisfaction of an antecedent debt; and (b) at the time Unified Commercial made the installment payments of the Interest to Associates, it had a contractual obligation to pay the Interest; (5) the use of $100,000.00 for a year is property and, therefore, is reasonably equivalent value for the payment of interest at twelve percent (12%) per annum; (6) in connection with the Trustee's constructive fraud causes of action under Section 544(b)(1) and DCL Sections 273–275, Unified Commercial received fair consideration[3] in exchange for the payment of the

---

**2.** Section 548(d)(2)(A) provides that:

(d)(2) In this section—
(A) "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor[.]

11 U.S.C. § 548(d)(2)(A) (2000).

**3.** DCL § 272(a) provides that:

Fair consideration is given for property, or obligation.
(a) When in exchange for such property, or obligation, as a fair equivalent therefor,

Interest when it received the use of the $100,000.00 investment made by Associates and Weisz and incurred a contractual obligation to pay the Interest; (7) in connection with the Trustee's causes of action for actual fraud under Section 548(a)(1)(A) and DCL Section 276, the Trustee had not and would not be able to plead sufficient facts to establish that the installment payments of the contractually required Interest were made by Unified Commercial with the actual intent to hinder, delay and defraud creditors; and (8) because the contractually required installment payments of the Interest by Unified Commercial to Associates were in exchange for reasonably equivalent value and fair consideration, and not made with the actual intent to hinder, delay and defraud creditors, the Trustee's Complaint in the Adversary Proceeding should be dismissed.

In opposition to the Dismissal Motion, the Trustee interposed: (1) the Affidavit of James A. Marasco, one of the Certified Public Accountants for the Trustee, which set forth his opinion that Unified Commercial did not operate a legitimate business enterprise, but from its inception was operating a scheme of borrowing from one investor to pay another investor with no intention of fully paying all investors; and (2) the Affidavit of one of the Trustee's attorneys (the "Attorney Affidavit"), which included a copy of an Agreement to Place Funds in Escrow Account (the "Account Agreement"). The Attorney Affidavit asserted that: (1) Associates placed $100,000.00 on deposit with Unified Commercial pursuant to the terms of the Account Agreement, with the understanding that the funds "will be loaned, invested or otherwise used at the sole discretion of the management of Unified Commercial," for a period of five years, with Associates to

receive interest payments at the rate of twelve percent (12%) per annum annually on the 24th day of February of each payment year; (2) the Account Agreement further provided for an early withdrawal penalty of six percent (6%) on any principal withdrawn from the Account prior to the maturity date of February 24, 2002; (3) the Account Agreement was the only agreement that governed the investment by Associates and Weisz that was the subject of the Trustee's Complaint; (4) Unified Commercial maintained only one bank account, a checking account at Chase Manhattan Bank, N.A., into which all of the funds that it received from its investors were deposited; and (5) Unified Commercial made payments to Associates of $131.52 on March 1, 1997, $3,000.00 on June 1, 1997, $3,000.00 on September 1, 1997, $3,000.00 on December 1, 1997 and $102,794.80 on February 24, 1998.

In their respective Memorandums of Law the parties set forth the classic arguments of trustees and so-called "winners," investors in a "Ponzi" scheme who receive back more than their principal investment, as to whether trustees can avoid payments to a "winner" of amounts in excess of their original investment as constructively fraudulent transfers under Section 544(b)(1) and applicable New York State Law, and Sections 548(a) and 550(a), depending upon whether the payments were made within one year or between one year and six years of the filing of a bankruptcy petition, because the debtor did or did not receive reasonably equivalent value or fair consideration for the payments of any excess.

The Trustee, relying upon *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843 (D.Utah 1987) (citations

and in good faith, property is conveyed or an antecedent debt is satisfied[.]

NY Debtor & Creditor Law § 272(a) (1979).

omitted) (*"Independent Clearing"*) and the decisions of three other federal courts that have decided the issue, supported by a law review article, argued that, even though under the Account Agreement Unified Commercial had a contractual obligation to pay the Interest, so that the payments would otherwise be transfers in satisfaction of an antecedent debt, because Unified Commercial was engaged in a "Ponzi" scheme, to permit Associates to enforce the contractual obligation and be paid the Interest would be against public policy, in that Associates would be unjustly enriched at the expense of other investors of Unified Commercial who would receive less of a distribution, some not even receiving the return of their principal investment.[4] The Trustee further argued, once again relying upon *Independent Clearing,* that if an objective standard is used for determining "value" in connection with Sections 548(a)(1)(B) and 548(d)(2)(A), the use of funds by an entity engaged in a "Ponzi" scheme, which would otherwise clearly constitute value received, should be deemed by the Court, as a matter of law, not to be value received because to do so would once again negatively impact on the distribution to be received by other investors.[5]

In their Memorandum of Law, Associates and Weisz argued that, for purposes of Section 548(a) of the Bankruptcy Code and Article 10 of the DCL, because being engaged in a "Ponzi" scheme is not a stated exception to the provisions of those statutes: (1) Unified Commercial had a contractual obligation to pay Associates the Interest, which was specifically designated as interest and not a return of capital or otherwise a return on investment, so that its payment was in satisfaction of an antecedent debt; and (2) even if when Unified Commercial made the payments of the Interest it did not have an enforceable

4. "However, in some cases 'the interest of the public rather than the equitable standing of individual parties, is of determining importance' (citation omitted). Therefore, any money that a defendant might recover in excess of his undertaking in an action on the contract could not come from the debtors but would have to come from money that rightfully belonged to other, defrauded undertakers. Enforcement of a contract such as those involved here would therefore hurt the debtors' other creditors by depleting the pool of assets to which they could look for payment (citation omitted). If the contract were enforced, the party who received the benefits of his contract would be unjustly enriched at the expense of other defrauded undertakers. In short, to enforce the contract as to fictitious profits would only further the debtors' fraudulent scheme. We therefore conclude that, as a matter of public policy, the contracts involved in this case were unenforceable to the extent they purported to give the defendants a right to payments in excess of their undertaking." *Independent Clearing,* 77 B.R. at 858.

5. " 'Value' must be determined by an objective standard (citation omitted). If the use of the defendants' money was of value to the debtors, it was only because it allowed them to defraud more people of more money. Judged from any but the subjective viewpoint of the perpetrators of the scheme, the 'value' of using others' money for such a purpose is negative (citation omitted). But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetrate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called 'reasonably equivalent value' (citation omitted). We therefore conclude that the debtors did not receive 'value' in exchange for transfers to a given defendant to the extent the transfers exceeded the amount the defendant had advanced to the debtors. *A fortiori,* the debtors did not receive a 'reasonably equivalent value' in exchange for those transfers." *Independent Clearing,* 77 B.R. at 859.

contractual obligation to pay the Interest, when it received the use of $100,000.00 for a year, it received reasonably equivalent value and fair consideration for the payments of the Interest.

■ At the hearing conducted by the Court on the Dismissal Motion, the parties agreed that the Motion could not be granted in all respects because there were material issues of fact as to whether Associates and Weisz had at all times acted in good faith in connection with the transactions. Unanswered questions raised by the Complaint included: (1) why was the Interest paid in quarterly installments rather than in an annual installment as specifically provided for in the Account Agreement; (2) why was Associates repaid its principal investment after one year, rather than after the five year stated maturity; (3) why did Associates not pay the six percent (6%) early termination penalty as specifically provided for in the Account Agreement;[6] and (4) was Unified Commercial paying twelve percent (12%) interest to other investors who invested for only one year rather than five years?

Even though the Dismissal Motion could not be granted in all respects, the parties requested that the Court issue a Decision & Order on the narrow issue of whether, if Unified Commercial was engaged in a "Ponzi" scheme, it had received reasonably equivalent value and fair consideration under Section 548(a) and Article 10 of the DCL for the payment of the Interest to Associates.

## DISCUSSION

### I. Summary of Decision

The next best solution would be for everyone to share pro rata in the inevitable losses. In theory, this solution is

what the trustee sought by his third cause of action: all undertakers would put back on the shelf what they had received, and the trustee would redistribute the money equitably ... Unable to do perfect justice, this court must do the only thing it can do—namely, apply the applicable law to the facts of the case, on the assumption that that law will best approximate justice ... Moreover, by definition all transfers in furtherance of a Ponzi scheme are preferential, yet under the Code the trustee may recover only those transfers made within ninety days before bankruptcy. Although he may recover earlier transfers as fraudulent conveyances, a defendant may keep such transfers to the extent he gave value for the transfer and took it in good faith. In short, the Code simply does not provide an effective way for the trustee to recover all transfers in furtherance of a Ponzi scheme. If Congress desires such a result, it may need to amend the Code. *Independent Clearing,* 77 B.R. at 887–888.

Even though it has been more than sixteen years since *Independent Clearing* was decided by the Bankruptcy Court and thirteen years since it was decided by the District Court, Congress has not provided the comprehensive and, therefore, presumably "just" solution to the losses occasioned by a "Ponzi" scheme that the District Court in *Independent Clearing* realized was necessary because the Bankruptcy Code and applicable state fraudulent conveyance statutes did not provide that solution.

Courts such as the District Court in *Independent Clearing* appear to believe that a "just" solution to the losses suffered

---

6. A waiver of or failure to collect the six percent (6%) penalty by Unified Commercial may be determined to be an avoidable fraudulent conveyance.

by the innocent investors in a "Ponzi" scheme requires some reallocation of the risks and redistribution of the losses beyond that provided for by Congress in Section 547(b).[7] In my view, the fraudulent conveyance statutes cannot and should not be utilized by courts as a super preference statute to effect a further reallocation and redistribution that should be specifically provided for in a statute enacted by Congress.

The Section 548(a) and state law fraudulent conveyance statutes implement a policy of preventing the diminution of a debtor's estate. The Section 547(b) preference statute implements a principal policy of equality of distribution.

By forcing the square peg facts of a "Ponzi" scheme into the round holes of the fraudulent conveyance statutes in order to accomplish a further reallocation and redistribution to implement a policy of equality of distribution in the name of equity, I believe that many courts have done a substantial injustice to those statutes and have made policy decisions that should be made by Congress.

If the law is to be that it is against public policy for an innocent investor victim of a "Ponzi" scheme to enforce the contractual obligation of the bankrupt schemer to pay reasonable interest for the use (loan) of funds, I believe that law should be enacted by Congress, not by the courts.

Furthermore, if the use (loan) of funds for a period of time is not to be considered value or fair consideration to support the payment of reasonable contractual interest simply because the bankrupt entity receiving the use (loan) of the funds was engaged in a "Ponzi" scheme, I believe that Congress should specify that in the Bankruptcy Code, rather than for the courts to continue to ignore what is clearly value and fair consideration under the applicable fraudulent conveyance statutes.

Unified Commercial received reasonably equivalent value within the meaning of Section 548 of the Bankruptcy Code for the use (loan) of the $100,000.00 for a year. In addition, assuming Associates and Weisz at all times operated in good faith in connection with the transaction, Unified Commercial received fair consideration within the meaning of Article 10 of the DCL.

## II. The Payment of Antecedent Debt as Value

Unified Commercial had a contractual obligation under the Account Agreement to pay the Interest to Associates. Courts such as *Independent Clearing* believe that it is unfair, unjust and against public policy for an innocent investor victim of a "Ponzi" scheme to receive reasonable con-

---

7. Section 547(b) provides that:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C. § 547(b) (2000).

tractual interest[8] when other investors have not recovered all of their principal, because the payment of interest to an innocent investor victim: (1) diminishes the debtor's estate, so that there is less available for other innocent investors; (2) does not come from profits or even independent cash flow generated by the debtor, but is paid from the funds of other innocent investors; (3) unjustly enriches that innocent investor victim at the expense of other innocent investors who did not recover all of their principal; and (4) furthers the fraudulent scheme.

## A. Public Policy in General

I simply do not agree that it is against sound public policy to allow an innocent investor victim to enforce a contract with an entity engaged in a "Ponzi" scheme to pay a reasonable rate of interest for the use (loan) of funds. Therefore: (1) the contractual obligation by Unified Commercial to pay interest to Associates was enforceable when the payments of the Interest were made; and (2) the payments were in satisfaction of an antecedent debt.

Although I do not condone "Ponzi" schemes, I do not understand why courts have found them to be so different from the many other fraudulent schemes seen in bankruptcy cases where innocent individuals lose money, that they are willing, in the name of public policy, to do what I consider to be such an injustice to the fraudulent conveyance statutes by ignoring the universally accepted fundamental commercial principal that, when you loan an entity money for a period of time in good faith, you have given value and are entitled to a reasonable return.[9]

Although many courts that have decided this issue seem to believe that it is more "just" to require that an innocent investor victim who received reasonable contractual interest return it so that it can be redistributed among the investors who did not recover all of their principal, I do not believe that partial solution is more "fair" or "just" than allowing that victim to keep the interest. Furthermore, I believe that the majority of the general public would agree that allowing those victims to keep their interest is as fair or even a more fair solution. All of the investors took a series of risks when they loaned substantial sums to Unified Commercial, including that they might not be repaid any of their principal, only a portion of their principal or their principal and none or not all of their contractual interest. However, each investor expected to be repaid their principal plus contractual interest. The risks also included the possibility that Unified Commercial might be engaged in a fraudulent scheme or even a "Ponzi" scheme. I believe that even the other innocent investor victims who did not recover any or all of their principal, if they were able to put aside their own self interest, would not find it unfair or unjust that other innocent investor victims received the very benefits for which all of the investors bargained and contracted, which was to be repaid their principal together with contractual interest.

---

**8.** To the extent that an innocent investor victim receives interest in excess of what a Court determines to be reasonable, the receipt of the excess could be determined to have been without value and fair consideration.

**9.** Because the Commission has referred to those who entered into an Account Agreement, which is a "security," as an investor, and the existing case law refers to them as investors, they are referred to in this Decision & Order as investors. However, the relationship between Associates and Unified Commercial was actually one of creditor and debtor, and since the transaction was structured as a loan transaction, they were lender and borrower.

352

## B. Diminution of the Estate

 The underlying policy of the Section 548(a) and state law fraudulent conveyance statutes is to prevent the diminution of a debtor's estate as viewed by the debtor's creditors.[10] The estates of many debtors where borrowed funds do not produce profits, or even income, including those of: (1) hopelessly insolvent consumer debtors with negative monthly disposable income who borrow money they will never repay so that they can do things such as go on vacation; and (2) hopelessly unprofitable businesses, are diminished by paying interest on funds borrowed when they had negative disposable income or were unprofitable. Nevertheless, trustees do not pursue as fraudulent conveyances the interest payments made by those consumers and unprofitable businesses more than ninety days before their bankruptcy petitions are filed by arguing to the Court that to allow the enforcement of their contracts to pay reasonable interest would be against sound public policy because there was a diminution of the estate at a time when the debtor could never repay all of its creditors.

In addition, allowing the enforcement of contracts entered into by a "Ponzi" schemer for the providing of goods and services with ordinary trade creditors, such as utility companies and landlords, results in as much of a diminution of the estate as paying reasonable contractual interest to some investors, since the payments for those goods and services could only come from the funds of investors.

What did the innocent investor victims that received reasonable contractual interest payments do so wrong to diminish the estate of Unified Commercial that the trade creditors did not do? Again, if it is simply a question of reallocating the risks and redistributing losses among those giving value and fair consideration to an entity engaged in a "Ponzi" scheme, isn't that for Congress to do?

## C. Furtherance of the Fraudulent Scheme

"Ponzi" schemes are perpetuated not just by some investors receiving interest payments but also by some investors receiving interest payments and their principal back, especially if, as often happens, those investors then reinvest the principal. Therefore, allowing investors to retain any reasonable contractual interest does not further a "Ponzi" scheme any more than allowing other investors or that same investor to retain repaid principal. Furthermore, in this case, goods and services provided by trade creditors, such as telephone service, office space, and power to run computers, allowed Unified Commercial to appear to be a legitimate business and also furthered its fraudulent scheme.

## D. Unjust Enrichment

All of the payments that Unified Commercial made to its investors, whether principal or reasonable contractual interest, came from the funds of other investors. To find that "winners" are unjustly enriched when they receive the funds of

---

10. Unlike the Section 548(a) and state law fraudulent conveyance statutes, one of the principal underlying policies of the Section 547 preference statute is equality of distribution. When a creditor pursues a state law cause of action to avoid a fraudulent conveyance, it pursues the cause of action in its own name and for its own benefit, not for the benefit of all creditors. Since only trustees, as representatives of the estate, can avoid transfers under Section 548(a), one of the results of any recovery by the trustee, who distributes the recovery to all creditors, is equality of distribution. However, that does not make equality of distribution one of the underlying policies of Section 548(a) and it does not justify the use of that statute for the sole purpose of redistributing losses.

other investors as reasonable contractual interest, but not when they receive them in repayment of their principal, seems to be a legal distinction without much meaning, especially when there is nothing really "unfair" or "unjust" about an innocent investor victim receiving reasonable contractual interest for the use (loan) of funds.

## III. The Use of Funds as Value

 Unified Commercial agreed to pay innocent investors, such as Associates and Weisz, twelve percent (12%) interest per annum for the use (loan) of their funds for a period of time. I do not believe that in 1997 receiving interest at twelve percent (12%) per annum for the use of $100,000.00 for a minimum of one year by an uninsured entity was an unreasonable rate of contractual interest.

Courts such as *Independent Clearing* have held that a "Ponzi" schemer received no value or fair consideration for the use (loan) of an innocent investor victim's funds because: (1) the only value that the schemer received from the use of the funds was to be put into a position to defraud more innocent investors; (2) from an objective viewpoint the value of the use of funds to perpetuate a fraudulent scheme is negative; and (3) the payment of reasonable contractual interest for the use of funds diminishes the assets available to pay other innocent investors who have not been repaid their principal.

Factually, Unified Commercial received value and fair consideration from Associates when it loaned Unified Commercial $100,000.00 for a year, which entitled Associates to the payment of reasonable contractual interest. Therefore, even in the absence of an enforceable contractual obligation, the payments of the Interest were for value and, if Associates was at all times operating in good faith in connection with the transaction, fair consideration received.

As a result, the payments were not subject to avoidance as fraudulent transfers.

For courts to make the payment of reasonable contractual interest for the use (loan) of funds to a "Ponzi" schemer not value, as a matter of law, without extending that same determination to payments made by the schemer to other creditors, makes no sense. If a "Ponzi" schemer did not receive value for the use (loan) of funds because those funds diminished its estate and allowed it to perpetuate its fraudulent scheme, then the payments for all otherwise commercially recognizable value that also diminished the estate and allowed it to perpetuate the scheme, such as supplying utilities, space, supplies and labor, should also be found to be avoidable fraudulent transfers. As a matter of law, those payments to trade creditors were no more for value received than the use of funds in the hands of a fraudulent "Ponzi" schemer.

Value is a question of fact, not a question of law. However, if what is clearly value and fair consideration, the use (loan) of funds for a period of time in exchange for the payment of reasonable contractual interest, is not to be value as a matter of law for purposes of the fraudulent conveyance statutes, which is contrary to common sense, I believe that that determination should be made by Congress. If courts, rather than Congress, continue to deem commercially recognized value not to be value as a matter of law, the arguments of trustees in the future might force courts to justify what value, as a matter of law, that consumer debtor received through the eyes of his creditors which would justify the payment of interest more than ninety days before the petition for the funds borrowed for that vacation, or why the trustee of a bankrupt ".com" company that never made a profit should not be able to avoid

the interest payments the company made to its lenders.

## IV. Overview

All of the investors took a risk that Unified Commercial might be engaged in a fraudulent operation or a "Ponzi" scheme.

If Congress chooses to enact a statute that reallocates the risks and redistributes the losses occasioned by a bankrupt entity having engaged in a "Ponzi" scheme beyond that provided for in Section 547(b), such as by enacting an extended reach-back provision for "Ponzi" schemes under Section 547(b), because Congress believes that to be a fair, just and necessary solution to the "Ponzi" scheme problem, that is what Congress can and perhaps should do. In the absence of such an enactment by Congress, I do not feel that the existing partial solution advanced by many courts in this developing area of law, which is to unfortunately and inappropriately utilize the fraudulent conveyance statutes as a super preference statute, and then only to recover contractual interest received by innocent investor lenders who have also recovered their principal, is any better, more fair or more just than leaving those innocent investors who received interest payments more than ninety days before the petition where they were.

Although courts, like the District Court in *Independent Clearing*, have questioned whether they should adopt this partial solution, they have still gone ahead and done so.

It is time for Congress to act.

### CONCLUSION

Unified Commercial received reasonably equivalent value within the meaning of Section 548 of the Bankruptcy Code for the use (loan) of the $100,000.00 for a year. In addition, assuming that Associates and Weisz at all times operated in good faith in

connection with the transaction, Unified Commercial received fair consideration within the meaning of Article 10 of the DCL.

This Adversary Proceeding is set down for pretrial on May 22, 2001 at 11:00 a.m.

**IT IS SO ORDERED.**