**In re CARROZZELLA & RICHARDSON, Debtor.**

Michael J. Daly, as Chapter 7 Trustee for Carrozzella & Richardson, Plaintiff–Appellant,

v.

Zofia Deptula, Defendant–Appellee.

Michael J. Daly, as Chapter 7 Trustee for Carrozzella & Richardson, Plaintiff–Appellant,

v.

Carol Geremia, Defendant–Appellee.

Michael J. Daly, as Chapter 7 Trustee for Carrozzella & Richardson, Plaintiff–Appellant,

v.

May Ann Gilman, Defendant–Appellee.

Michael J. Daly, as Chapter 7 Trustee for Carrozzella & Richardson, Plaintiff–Appellant,

v.

Mildred Mariotti, Defendant–Appellee.

Michael J. Daly, as Chapter 7 Trustee for Carrozzella & Richardson, Plaintiff–Appellant,

v.

Gioacchino Parete, Defendant–Appellee.

Michael J. Daly, as Chapter 7 Trustee for Carrozzella & Richardson, Plaintiff–Appellant,

v.

Esther Susie, Defendant–Appellee.

Bankruptcy No. 95–31231.

Nos. 3:02CV0058(GLG), 3:02CV0059(GLG), 3:02CV0060(GLG), 3:02CV0061(GLG), 3:02CV0062(GLG), 3:02CV0063(GLG).

Adversary Nos. 96–3162, 96–3164, 96–3165, 96–3169, 96–3173, 96–3176.

United States District Court,

D. Connecticut.

Aug. 1, 2002.

Douglas S. Skalka, Nancy B. Kinsella, James A. Lenes, Neubert, Pepe & Monteith, New Haven, CT, for Michael J. Daly.

Robert George Wetmore, Wallingford, CT, for Zofia Deptula, May Ann Gilman, Mildred Mariotti and Esther Susie.

Jeremiah J. Morytko, Giuletti & Morytko, North Haven, CT, for Carol Geremia.

Gerard I. Adelman, Weigand, Mahon & Adelman, Meriden, CT, for Gioacchino Parete.

## OPINION

GOETTEL, District Judge.

This consolidated appeal arises from six adversary proceedings filed in the United States Bankruptcy Court for the District

of Connecticut, in which the Trustee, pursuant to 11 U.S.C. § 544(b), sought to recover certain interest payments, which the Debtor made to the Defendants, on the ground that these payments were fraudulent transfers under Conn. Gen.Stat. § 52–552f. The Bankruptcy Judge ruled in favor of the Defendants in each case, holding that the Trustee had failed to establish his entitlement to relief under Conn. Gen.Stat. § 52–552f. For the reasons set forth below, the decisions of the Bankruptcy Judge are affirmed.

### Jurisdiction

This Court has jurisdiction over these appeals from final judgments of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1).

### Issues Presented on Appeal

This appeal presents two issues of law for this Court's review:

1. Did the Bankruptcy Court err in holding that the Trustee failed to establish that the Debtor made the challenged transfers to the individual Defendants without receiving reasonably equivalent value, Conn. Gen.Stat. § 52–552f(a)?

2. Did the Bankruptcy Court err in finding that a Debtor who runs a Ponzi scheme may receive reasonably equivalent value in exchange for payments made to Ponzi scheme "investors"?

### Standard of Review

■ Because the issues presented on appeal are questions of law, we review the decision of the Bankruptcy Court *de novo*. *In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 89 (2d Cir.1992).

### Background Facts

The Bankruptcy Court's Findings of Fact are not challenged in these appeals. Indeed, most of the facts were stipulated to by the parties below.[1]

As described by Bankruptcy Judge Dabrowski, each of these adversary proceedings presents "another chapter in the sordid history of the financial dealings of Attorneys John A. Carrozzella and Thomas J. Richardson" and the firm of Carrozzella & Richardson ("C & R"), which ran a fraudulent investment scheme, known as a Ponzi scheme,[2] that attracted scores of investors, including Defendants, over a

---

1. Three of the cases, *Deptula, Gilman,* and *Susie,* were tried based upon Stipulation of Facts and Admissibility of Documents as Full Exhibits. The other three cases were tried to the Bankruptcy Court through witnesses' presentation of evidence.

2. Named after the debtor, Charles Ponzi, in *Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), in a "Ponzi" scheme, an enterprise makes payments to investors with monies received from newly attracted investors, rather than from profits of a legitimate business venture. Generally, investors are promised large returns on their investments, and initial investors are in fact paid sizeable returns. Those payments help to attract new investors by giving the impression that a legitimate business opportunity exists. The money from new investors is then used to repay the earlier investors in order to

keep the scheme afloat. All the while, the promoters, or Ponzi-scheme operators, as they are often called, draw off money from the scheme. The enterprise operates and continues to operate at a loss. Ultimately, as the enterprise gets further and further into debt, the pyramid collapses, leaving most investors with neither their principal investments nor the promised profits. *See In re Lake States Commodities, Inc.,* 272 B.R. 233, 241 (Bankr.N.D.Ill.2002); Transcript of the Testimony of Richard Finkel at 14 before the Bankruptcy Court in Other Proceedings (Nov. 17, 1997)(part of the record on appeal in all six cases)(hereinafter "Finkel Tr."); *see also Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1088 n. 3 (2d Cir.1995); *Balaber-Strauss v. Lawrence,* 264 B.R. 303, 305–06 (S.D.N.Y.2001); Mark·A. McDermott, *Ponzi Schemes and The Law of Fraudulent and Pref-*

period spanning two decades. *See In re Carrozzella & Richardson (Daly v. Biafore)*, 237 B.R. 536 (Bankr.D.Conn.1999). Defendants are six such investors, who had the good fortune to withdraw all of their funds, plus interest, held by C & R prior to its financial collapse. These adversary proceedings were brought by the Trustee pursuant to 11 U.S.C. § 544(b)(1995),[3] in an attempt to recover from Defendants the interest payments[4] received by them, based on a theory of constructive fraud, under Connecticut's Uniform Fraudulent Transfer Act, Conn. Gen.Stat. § 52–552f(a).

C & R was a general partnership that operated as a law firm in Wallingford, Connecticut, from the late 1970's until 1991. After 1991, it ceased operating as a law firm but continued to operate as an investment vehicle for its general partners, John A. Carrozzella and Thomas J. Richardson. At some point in time, not determined in these proceedings, C & R became involved through the fraudulent activities of Attorney Carrozzella in a criminal enterprise possessing many of the attributes of a Ponzi scheme. The firm solicited investors[5] to deposit funds with it in exchange for a promised[6] annual rate of

---

*erential Transfers,* 72 Am. Bankr.L.J. 157, 158 (1998).

**3.** The Bankruptcy Code provides two avenues for a trustee to recover fraudulent transfers made by the debtor. A trustee may bring a claim under either § 548 or § 544, which incorporates state non-bankruptcy law, which in most states is either the Uniform Fraudulent Transfer Act ("UFTA") or the older Uniform Fraudulent Conveyance Act ("UFCA"). *See* David F. Kurwaza II, Note, *When Fair Consideration Is Not Fair,* 11 Cornell J.L. & Pub. Pol'y 461, 465 (2002). With few exceptions, the basic principles governing fraudulent transfer actions are the same, regardless of the statutory basis used. *See In re Pajaro Dunes Rental Agency, Inc.,* 174 B.R. 557, 572 (Bankr.N.D.Cal.1994)("Unless otherwise specified, common-law authorities and case-law dealing with the UFCA, UFTA, Bankruptcy Act of 1898 or the Bankruptcy Code may be cross-referenced whatever the statutory basis of the action at bar.") Additionally, a trustee has two theories of recovery that he or she may exercise to recover funds from a Ponzi scheme investor: constructive fraud and actual fraud. Kurwaza, *supra* at 463; McDermott, *supra* note 2, at 160. In this case, the Trustee sought to recover the interest payments under a constructive fraud theory pursuant to § 544(b) of the Bankruptcy Code, which allows him to exercise the rights of an unsecured creditor to avoid any transfer of the Debtor's property that is voidable under State law. *See In re All–Type Printing, Inc.,* 274 B.R. 316, 322 (Bankr.D.Conn.2002). Undoubtedly, he chose to proceed under

§ 544(b), as opposed to § 548(a)(1)(B), in order to take advantage of Connecticut's four-year statute of limitations applicable to actions brought under Connecticut's Uniform Fraudulent Transfer Act, Conn. Gen.Stat. § 52–552f. *See* Conn. Gen.Stat. § 52–552j. Section 548(a), on the other hand, has a one-year statute of limitations, which would have substantially diminished the Trustee's recovery in this case.

**4.** The Trustee, like many courts, refers to these interest payment as "False Profits." We decline to adopt that terminology for the reasons discussed below.

**5.** A number of the investors were former clients of the law firm. There is nothing in the record to suggest that any of the Defendants were aware that C & R was running a Ponzi scheme.

**6.** Upon receipt of the funds, John Carrozzella would write each investor a letter on firm letterhead stationery, acknowledging receipt of the money, stating that the money would be invested for him or her, and stating the rate of return on an annual, monthly and daily basis, which interest he represented to be tax free. The letter promised a monthly accounting of principal and interest. The letter then concluded by telling the investor that any or all of the money could be withdrawn at any time, since there was no minimum time of deposit. Monthly statements were then sent to each investor showing the previous balance and new balance, the interest rate, and annual, monthly and daily interest earned.

return between 8% and 15%.[7] The funds deposited with C & R were not regularly invested or used in any legitimate business enterprise that could produce the promised returns. Instead, C & R solicited new investors and used their money to pay prior investors their promised returns. *See* Finkel Tr. at 16. C & R commingled the funds placed with it by a given investor with funds deposited by other investors and other entities, as well as the general revenue of the legal practice of C & R. All money was placed in a general office account that was used, *inter alia*, to pay operating and payroll expenses, and to invest in various schemes, including limited partnership interests in a nut partnership, a race horse partnership, and condominium units. Accountant Richard Finkel, who testified in these proceedings, described the bank account of C & R as "one big pot of money ... [T]here basically was one account ... All the money that came into that firm, whether it was from a real estate closing, legal fees, so-called investors, whatever, it was went into that pot of money." Finkel Tr. at 12–13.

Over time, some of the earlier investors, including Defendants, received a return of their principal plus additional monies, representing interest paid on the principal. More recent investors, however, received little, if anything, and lost virtually all of their principal investments.

On July 19, 1995, an involuntary petition for relief under Chapter 7 was filed against the Debtor, C & R, on July 19, 1995 (the "Petition Date"). By the Petition Date, C & R had been insolvent for a number of years. On August 21, 1995, an Order for Relief was entered upon the Petition, and Michael J. Daly, Plaintiff–Appellant, was appointed Chapter 7 Trustee of the Debtor's bankruptcy estate. The Trustee then commenced these six adversary proceedings seeking to recover all interest payments made to Defendants within four years of the Petition Date. The following amounts were sought from each Defendant: [8]

| | |
|---|---|
| Zofia Deptula | $ 966.00 [9] |
| Carol Geremia | 7,562.55 [10] |
| Mary Ann Gilman | 947.00 [11] |
| Mildred Mariotti | 8,179.31 [12] |

7. Although many Ponzi schemes characteristically use exorbitantly high rates of return to entice new investors, the interest rates promised by C & R were not unreasonably high. The highest interest rate, 15%, was promised to Defendant Parete. However, his investments with C & R commenced in 1981, when the prime rate of interest was in excess of 15%. *See* Historical Prime Interest Rates, Federal Reserve Bank of New York, available at http://www.newyorkfed.org/pihome/statistics (ftp://ftp.ny.frb.org/prime/Prime.txt). The other interest rates were either below prime or slightly above prime.

8. These interest figures represent the difference between the total deposits made by a Defendant and the total amount received by that Defendant from C & R, less any interest payments received more than four years prior to the Petition Date.

9. Defendant Deptula deposited a total of $10,199.00 between 1992, and 1993. In exchange, she was promised repayment with interest at an annual rate of 10%. Through multiple transfers in 1992 and 1993, she was repaid the principal, plus interest totaling $966.00.

10. Defendant Geremia deposited a total of $124,848.36 between 1990 and 1991. C & R agreed to pay her interest at the annual rate of 8%. Through several transfers, she was repaid her principal plus interest aggregating $7,562.55.

11. Defendant Gilman deposited a total of $21,407 between 1991 and 1992, and was promised an interest rate of 10%. Through multiple transfers, C & R returned her principal payments to her, plus interest of $946.85.

12. Defendant Mariotti deposited funds in the aggregate amount of $70,000 in 1983, for which she was promised interest at an annual rate of 8%. She received funds from C & R

Gioacchino Parete     16,542.11 [13]
Esther Susie         19,736.15 [14]

Following the submission of stipulated facts and/or a trial in each of these actions,[15] the Bankruptcy Court issued its Findings of Fact and Conclusions of Law, holding that the Trustee had failed to establish an essential element of his claim, specifically that the Debtor made the subject transfer to the Defendant without receiving equivalent value in return. Accordingly, the Bankruptcy Court entered judgment in favor of each Defendant, and this appeal ensued.

### Discussion

■ Section 544(b) of the Bankruptcy Code, 11 U.S.C. § 544(b)(1995), in effect on the Petition Date, provides:

> The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor *that is voidable under applicable law* by a creditor holding an unsecured claim that is allowable under section 502 of this title. . . .

(Emphasis added). The "applicable" state law invoked by the Trustee in this case is Connecticut's Uniform Fraudulent Transfer Act, which provides in relevant part:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer

was made or the obligation was incurred if the debtor made the transfer or incurred the obligation *without receiving a reasonably equivalent value in exchange for the transfer* or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Conn. Gen.Stat. § 52–552f(a)(emphasis added).[16] Under § 52–552f(a), there are two critical elements that the Trustee must prove: (1) that the Debtor made the transfer without obtaining reasonably equivalent value in exchange for the transfer; and (2) that the Debtor was insolvent at that time or became insolvent as a result of the transfer. *See Mullen & Mahon, Inc. v. Mobilmed Support Services, LLC,* No. CV970064277S, 1999 WL 376489, at *5 (Conn.Super. May 28, 1999). Section 52–552d(a) provides that "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or *an antecedent debt is secured or satisfied.* . . ." (Emphasis added).

■ Under Connecticut law, the Trustee bears the burden of proving the elements of Conn. Gen.Stat. § 52–552f by clear and convincing evidence. *Tessitore v. Tessitore,* 31 Conn.App. 40, 42–3, 623 A.2d 496 (1993)(decided under the prede-

---

totaling $108,068.78, of which $38,068.78 represented interest payments. A portion of these interest payments, $8,179.31, was paid within four years of the Petition Date.

**13.** Between 1981 and 1987, Defendant Parete deposited a total of $20,000 with C & R, which promised to pay interest at the rate of 15%. On multiple occasions, he received payments of interest aggregating $16,542.11, and in 1992, he withdrew his principal deposit of $20,000.

**14.** Defendant Susie deposited a total of $47,000 between 1987 and 1990 and was promised a return of 9% (later reduced to

8%). She was repaid all of her principal, plus interest aggregating $19,736.15.

**15.** *See* Note 1, *supra.*

**16.** Conn. Gen.Stat. § 52–552h(a), "Remedies of creditors," provides the Trustee with avoidance rights with respect to fraudulent transfers. It states:

> In an action for relief against a transfer or obligation under sections 52–552a to 52–5521, . . ., a creditor . . . may obtain: (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim . . . .

486

cessor statute, Conn. Gen.Stat. § 52–552 (repealed)).

■ In these cases, the Debtor's insolvency is not at issue.[17] Rather, the critical inquiry is whether the Trustee met his burden of proving that the Debtor received less than a reasonably equivalent value when it made interest payments to Defendants.

In its Conclusions of Law, the Bankruptcy Court found that each Defendant had entered into a separate contract with the Debtor each time he or she deposited funds.

> In each exchange, C & R received the Deposit, and the Defendant received the Debtor's *promise* to repay the Deposit on demand with interest (hereinafter, the "Promise"). C & R's repayment Promise created a "debt" owing to the Defendant (hereinafter, a "Debt").

Concl. of Law ¶ G.1. (original italics).

> Each Payment made by C & R to the Defendant—whether a return of principal or a payment of interest—constituted a separate "exchange" for purposes of C.G.S. § 52–552f(a). In each of those transactions, C & R made a Payment to the Defendant, and received in exchange a dollar-for-dollar satisfaction of the Debt. Satisfaction of an antecedent debt is explicitly acknowledged by C.G.S. § 52–552d(a) to be "value" for purposes of UFTA fraudulent transfer analysis.

Concl. of Law ¶ G.2.

The Trustee argues that the Bankruptcy Court's reasoning ignores a body of caselaw developed in Ponzi scheme cases, which holds that the so-called "investment contract" is illegal and unenforceable to the extent that it purports to provide a return in excess of the deposit. *See, e.g., In re Hedged–Investments Associates, Inc.,* 84 F.3d 1286, 1290 (10th Cir.1996)(holding that, in a Ponzi scheme, the investor's contract was unenforceable to the extent that it gave the investor the right to recover payments in excess of her investment. Therefore, the Ponzi operator owed no debt to the investor and there could be no satisfaction of an antecedent debt in exchange for the payment of profits); *In re Independent Clearing House,* 77 B.R. 843, 848, 858–59 (D.Utah 1987); *In re Randy,* 189 B.R. 425, 441 (Bankr. N.D.Ill.1995); *In re Taubman,* 160 B.R. 964, 985–86 (Bankr.S.D.Ohio 1993); *In re International Loan Network, Inc.,* 160 B.R. 1, 12, 15 (Bankr.D.D.C.1993). The Trustee asserts that to allow the Defendants to keep these "False Profits" would actually further the Debtor's fraudulent scheme and deplete the pool of assets from which other creditors could obtain payment. Additionally, the Trustee argues that the Debtor received no other value from the Defendant other than the use of his or her money, which can only be deemed a negative value in light of the illegal scheme in which it was involved.

Defendants, on the other hand, maintain that the Bankruptcy Court correctly found a dollar-for-dollar satisfaction of the debt (principal plus interest) owed to Defendants. Moreover, since C & R commingled law firm revenue with the investors' deposits, there was no proof offered by the Trustee that the funds the Defendants received were not paid out of law firm profits, as opposed to deposits received from

**17.** The Trustee's expert accountant, Richard Finkel, testified as to the Debtor's insolvency based on the partnership's tax returns. Finkel Tr. at 18–25. Additionally, a number of courts have held that an enterprise engaged in a Ponzi scheme is insolvent from its inception and becomes increasingly insolvent as the scheme progresses. *See In re Ramirez Rodriguez,* 209 B.R. 424, 432 (Bankr.S.D.Tex. 1997); *In re Randy,* 189 B.R. 425, 441 (Bankr.N.D.Ill.1995); *In re Taubman,* 160 B.R. 964, 978 (Bankr.S.D.Ohio 1993).

later investors. In this regard, Defendants argue, *In re Independent Clearing House,* cited by the Trustee, is distinguishable, since in that case, the sole source of funds from which investors were paid was deposits of other investors. Finally, they argue, even if the source of the interest payments was other investors' deposits, that does not render such payments less than equivalent value, for there is nothing in Conn. Gen.Stat. § 52–552f(a) to suggest an illegality exception to the "reasonably equivalent value" requirement. Thus, the source of the funds used for repayment is irrelevant.

There is a sharp split of authority on the issue of whether the payment of interest by a Ponzi scheme operator can ever constitute reasonably equivalent value. The Trustee has cited a line of cases supporting his position, which focuses on the fact that the debtor was involved in a Ponzi scheme and, thus, to permit the investors to enforce their agreements with the debtor would be against public policy and would allow them to profit at the expense of later investors, who received substantially less on their investments. *See, e.g., Hedged–Investments Associates,* 84 F.3d at 1289–90; *Randy,* 189 B.R. at 441; *Taubman,* 160 B.R. at 987; *Independent Clearing House,* 77 B.R. at 857; *see also In re M & L Business Machine Co.,* 198 B.R. 800, 807–08 (D.Colo.1996)(allowing the trustee to recover the interest or profits of an investor in a Ponzi scheme under § 548(a)(2)(A)); *In re National Liquidators, Inc.,* 232 B.R. 915, 919 (Bankr. S.D.Ohio 1998)(holding that the debtor received less than reasonably equivalent value, because all the debtor received in return for the transfer of "false profits" was the use of the investors' money to run a Ponzi scheme); *see generally* McDermott, *supra* note 2, at 164–70 (suggesting that almost all courts have held that a debtor does not receive reasonably equivalent val-

ue for payments made to investors that represent fictitious profits).

On the other hand, there is ample authority supporting the position of the Bankruptcy Court that the proper focus is the contractual relationship between the investor and the debtor and the *quid pro quo* thereunder. *See, e.g., Balaber– Strauss v. Lawrence,* 264 B.R. 303, 308 (S.D.N.Y.2001), *aff'g In re Churchill Mortgage Inv. Corp.,* 256 B.R. 664, 680 (Bankr.S.D.N.Y.2000)(holding that the Court must evaluate the consideration exchanged by the debtor and transferee in the specific transaction which the trustee seeks to avoid, not the transaction's impact on the debtor's overall business); *In re First Commercial Management Group, Inc.,* 279 B.R. 230, 236 (Bankr.N.D.Ill. 2002); *In re World Vision Entertainment, Inc.,* 275 B.R. 641, 657–58 (Bankr.M.D.Fla. 2002); *In re Unified Commercial Capital, Inc.,* 260 B.R. 343, 346–48 (Bankr. W.D.N.Y.2001).

Because our review of the Bankruptcy Court's ruling is *de novo,* we undertake a careful analysis of the divergent positions taken by the courts on this issue. Just recently, a similar analysis was undertaken by the Bankruptcy Courts in *First Commercial Management Group,* 279 B.R. at 235–39 (Bankr.N.D.Ill.2002)(Black, Bankr. J.), and *Unified Commercial Capital,* 260 B.R. at 349–353 (Bankr.W.D.N.Y.2001) (Ninfo, Bankr.J.). We borrow liberally from those decisions.

The line of cases cited by the Trustee has analyzed the issue of whether reasonably equivalent value has been received by a debtor in a Ponzi scheme by beginning with "established principles of Ponzi scheme jurisprudence: when facing fraudulent conveyance actions, investors may keep the principal amount of their investments, but they may not keep any profits

from the scheme." *First Commercial Management Group*, 279 B.R. at 236 (citing *Randy*, 189 B.R. at 437). The rationale is that to allow the investors in these fraudulent schemes to keep payments in excess of their actual investments would be allow them to profit at the expense of those investors who entered the scheme later and received nothing. *Id.* (citing *Randy*, 189 B.R. at 437–38). The next step in determining whether the debtor received value for the transfer is to assess the bargain that the debtor made which gave rise to his liability to his creditors. Since the debtor's liability for the payments arose under whatever agreement it made with each of the investors, whether the debtor was really indebted to the investors depends on whether or not they had a valid, enforceable right under their agreement to receive the payments. *Id.* at 237 (citing *Randy*, 189 B.R. at 440–41); *National Liquidators*, 232 B.R. at 919; *Taubman*, 160 B.R. at 985. These cases have then held that the contract between the Ponzi scheme principal and investors is not enforceable in excess of the amounts invested because the contract underlying the transaction is illegal and, therefore, no value could have been given by the transferee to the debtor for the transfer. *First Commercial Management Group*, 279 B.R. at 237 (citing *Randy*, 189 B.R. at 441); *Taubman*, 160 B.R. at 986; *see also In re Ramirez Rodriguez*, 209 B.R. 424, 434 (Bankr.S.D.Tex.1997). The cases have emphasized that "value" must be viewed from an objective standpoint and that, if use of the investors' money was of "value" to the debtor, the only "value" was to perpetuate the Ponzi scheme. Therefore, the "value" of that money, if anything, was "negative value." *See Taubman*, 160 B.R. at 986. Further, by helping the debtor

perpetuate his illegal scheme, the transfers between the debtor and investors only exacerbated the harm to the debtor's creditors by increasing the amount of claims, while diminishing the debtor's estate. *Id.; Randy*, 189 B.R. at 441. "The rub is that the payment came from a debtor operating a Ponzi scheme." *World Vision Entertainment*, 275 B.R. at 657.

In contrast to this line of cases, the cases supporting the Defendants and the position taken by the Bankruptcy Court below focuses on the discrete transaction between the debtor and the defendant, without regard to the nature of the debtor's overall enterprise. *See First Commercial Management Group*, 279 B.R. at 236 (citing *Churchill*, 256 B.R. at 677–79). The cases have cited the narrow language of the Uniform Fraudulent Transfer Act that refers to the transfer at issue. *See, e.g.*, Conn. Gen.Stat. § 52–552f(a)("without receiving a reasonably equivalent value *in exchange for the transfer*"). The courts have measured what was given against what was received *in that transaction. First Commercial Management Group*, 279 B.R. at 237 (citing *Churchill*, 256 B.R. at 679)(original emphasis). The Bankruptcy Court in *Churchill* described the "fatal legal flaw" in the reasoning adopted by the court in *Randy*, and the line of cases cited above, as follows:

> [I]t focuses not on a comparison of the values of the mutual consideration actually exchanged in the transaction between the Broker[18] and the Debtor, but on the value, or more accurately stated, the supposed significance or consequence of the Broker–Debtor transaction in the context of the Debtor's whole Ponzi scheme. . . . [T]he statutes and case law do not call for the court to assess the impact of an alleged

---

**18.** *Churchill* involved the trustee's attempts to recover brokerage commissions, as opposed to the instant case that concerns interest received by investors.

fraudulent transfer in a debtor's overall business. The statutes require an evaluation of the specific consideration exchanged by the debtor and the transferee in the specific transaction which the trustee seeks to avoid, and if the transfer is equivalent in value, it is not subject to avoidance under the law.

256 B.R. at 680. "Simply because a debtor conducts its business fraudulently does not make every single payment by the debtor subject to avoidance." *World Vision Entertainment*, 275 B.R. at 658.

The courts have then looked to the plain language of the Bankruptcy Code and the state-law fraudulent transfer acts that define "value" as including "satisfaction . . . of an antecedent debt." 11 U.S.C. § 548(d)(2)(A); *see* Conn. Gen.Stat. § 52–552d(a). In *Unified Commercial Capital*, 260 B.R. at 350, a case brought under § 548(a) of the Bankruptcy Code, the Court held that the payment of interest to innocent investors pursuant to a contractual obligation clearly constituted the satisfaction of an antecedent debt and, therefore, based upon the clear language of the statute, should be considered as the receipt of value by the debtor. The Court reasoned that the debtor's use of the investor's funds for a period of time supported the payment of reasonable contractual interest and, if Congress did not intend such a result when the debtor was involved in a Ponzi scheme, it should so specify in the Bankruptcy Code rather than leaving it to the courts to ignore what is clearly value and fair consideration under the fraudulent

conveyance statutes. *Id.* To hold otherwise, the Court held, would ignore the "universally accepted fundamental commercial principal that, when you loan an entity money for a period of time in good faith, you have given value and you are entitled to a reasonable return." *Id.* at 351.

The Court, in *Unified Commercial Capital,* further criticized the holdings in *Independent Clearing House* and its progeny, which have attempted to provide a "just" solution to the losses suffered by innocent investors in a Ponzi scheme by reallocating and redistributing the losses sustained. *Id.* at 349–51. In effect, the Court stated, these decisions have allowed the trustee to utilize the fraudulent conveyance statutes as "super preference" statutes [19] to effect a reallocation of the debtor's assets, a matter that should be left to Congress. *Id.* at 350.

> By forcing the square peg facts of a "Ponzi" scheme into the rounds holes of the fraudulent conveyance statutes in order to accomplish a further reallocation and redistribution to implement a policy of equality of distribution in the name of equity, I believe that many courts have done a substantial injustice to those statutes and have made policy decisions that should be made by Congress.

> If the law is to be that it is against public policy for an innocent investor victim of a "Ponzi" scheme to enforce the contractual obligation of the bank-

---

19. The Court noted that, unlike § 548(a) and state-law fraudulent conveyance statutes, which are designed to "right" the "wrong" of a single transaction received at the expense of the debtor's estate, the preference statute, § 547, has as its underlying purpose equality of distribution. *Unified Commercial Capital*, 260 B.R. at 352, n. 10. Put another way, "[p]referential transfer law has as its chief concern *distributional equality* . . . [I]ts essen-

tial function is to move the determination date of the estate backwards in time to effect a *redistribution* among creditors. By contrast, fraudulent transfer law is not concerned with equality *among* creditors. Instead, its goal is *distributional enhancement* for a diligent creditor or, in the context of bankruptcy, for *all* creditors." *In re Carrozzella & Richardson (Daly v. Parete),* 270 B.R. 92, 99 (Bankr.D.Conn.2001)(emphasis in original).

rupt schemer to pay reasonable interest for the use (loan) of funds, I believe that the law should be enacted by Congress, not by the courts.

*Id.*

The Court further rejected the public policy argument, which many courts have advanced, that it is more "just" to require an innocent investor to return the reasonable contractual interest so that it can be redistributed among investors who did not receive all of their principal. The Court reasoned that *all* investors took a series of risks when they invested, including that they might not get repaid their principal or their contractual interest, and that allowing those victims to keep their interest was as fair as the trustee's partial redistribution of that interest to other investors. *Id.* at 351. The Court further noted that there are many other debtors, such as hopelessly insolvent consumer debtors and unprofitable businesses, that borrow money they will never repay, yet trustees do not pursue as fraudulent transfers the interest payments made by these debtors, despite the fact that these payments have resulted in a diminution of the debtor's estate at a time when the debtor could never repay all of its creditors. *Id.* at 352.

The Court also questioned why innocent investors should be treated any differently than a Ponzi-scheme operator's trade creditors, such as utility companies and landlords, since the payment of contractual debts owing to these trade creditors diminishes the debtor's estate in the same manner that payment of reasonable contractual interest to innocent investors diminishes the estate. *Id.; see also World Vision Entertainment*, 275 B.R. at 658 (noting that to extend *Randy* to its logical extreme would be to authorize the debtor/Ponzischeme operator to sue and recover pay-

ments made to every vendor who supplied goods to the debtor and to recover wages paid to every employee of the debtor, even at the lowest level, just because the debtor was involved in an investment project that was ultimately determined to be illegal).

Finally, the Court questioned the holdings in other cases that have held that reasonably equivalent value can never be given when it is based on an illegal and unenforceable contract. The Court noted that these decisions have failed to explain why that illegal and unenforceable contract allows the repayment of principal but not interest.[20] *Unified Commercial Capital*, 260 B.R. at 353. As the Court noted, allowing an investor to retain reasonable contractual interest does not further a Ponzi scheme any more than allowing that investor to retain repaid principal. *Id.* All of the payments made by the debtor to its investors, whether principal or reasonable contractual interest, came from the funds of other investors. "To find that 'winners' are unjustly enriched when they receive the funds of other investors as reasonable contractual interest, but not when they receive them in repayment of their principal seems to be a legal distinction without much meaning, especially when there is nothing really 'unfair' or 'unjust' about an innocent investor victim receiving reasonable contractual interest for the use (loan) of funds." *Id.* at 353.

■ After a careful analysis of the divergent authority on this issue, we concur with the holding of the Bankruptcy Court that the proper focus of a fraudulent transfer inquiry is on the transfer itself, not the overall business practices of the Debtor. This is consistent with the language of the Uniform Fraudulent Transfer Act, which speaks in terms of the specific transaction.

---

20. Some courts, however, have justified the return of principal on restitutionary grounds.

*See International Loan Network*, 160 B.R. at 12.

In this case, the Debtor paid the Defendants the agreed upon interest for use of the Defendants' money over time. The interest rates were reasonable, and there is no suggestion in the record that Defendants were anything but innocent investors. There is nothing to suggest that they were aware that the Debtor was operating a Ponzi scheme. This was not the typical "too-good-to-be-true" investment scheme. In exchange for the interest paid to the Defendants, the Debtor received a dollar-for-dollar forgiveness of a contractual debt. This satisfaction of an antecedent debt is "value," Conn. Gen.Stat. § 52–552d(a), and in this case "reasonably equivalent value." To the extent that these Defendants had not been paid the interest owed, they would have been creditors of the Debtor's bankruptcy estate, asserting claims for unpaid interest.

■ As the Bankruptcy Court noted, there is nothing in the plain language of either the Bankruptcy Code or Connecticut's Uniform Fraudulent Transfer Act suggesting an illegality exception to the "reasonably equivalent value" requirement. As other courts have noted, if the illegality of the debtor's enterprise taints transfers of interest payments by the debtor, why does it not render *all* transfers voidable?

Additionally, there has been no proof that the monies these particular Defendants received from the C & R's "pot" of common funds were investment funds deposited by other investors as opposed to law firm revenues. This is particularly true with respect to those Defendants who received payments from the Debtor at a time when C & R was still receiving income from a legitimate law practice.

As recognized by the Bankruptcy Court in this case and the Court in *Unified Commercial Capital*, the language of the Uniform Fraudulent Transfer Act (which parallels § 548(a)(2)) is clear. To create what is perceived by some to be an "equitable" [21] exception to the plain language of the statute is to usurp the function of the legislature. There is nothing in the statute to support a finding that the Debtor did not receive "reasonably equivalent value" by virtue of the satisfaction of the debt owing to the investors, in return for its payment of contractual interest to Defendants, simply because the Debtor was engaged in a Ponzi scheme. Regardless of the Debtor's business, legitimate or otherwise, so long as the Debtor received "reasonably equivalent value" in exchange for its transfer of property, there has been no diminution in the Debtor's estate and the remaining creditors have not been damaged by the transfer. Had the insolvent Debtor simply given away money without an extinguishment of an underlying debt, the situation would be different. *See, In re C.F. Foods, L.P.*, 280 B.R. 103 (Bankr.E.D.Pa.2002)(holding that the debtor did not receive "reasonably equivalent value" in exchange for donations made to charitable organization). But, here, there was an extinguishment of a debt, such that those investors/creditors no longer have a claim against the Debtor's estate, which could diminish any recovery by the remaining creditors. As recognized by the

**21.** At least one commentator has observed that not all of the equities are on the side of the "other creditors." He notes that, although lawsuits to recover fraudulent transfers serve as a means to redistribute assets to creditors, they have a punitive effect on good faith investors. In many cases, by the time the trustee brings an action, the investor has already spent his return from his investment in the Ponzi scheme. Yet, because of the fraudulent activity of the bankrupt corporation, the good faith investor has to defend himself in court and face having to return the payments received to the estate. Kurwaza, *supra* note 3, at 463, 475–77.

Uniform Fraudulent Transfer Act and the Bankruptcy Code, satisfaction of an antecedent debt is value.

Accordingly, we agree with the Bankruptcy Court that the Trustee failed to establish that the Debtor did not receive reasonably equivalent value upon his payment of reasonable, contractual interest to the six Defendants. The fact that the Debtor was involved in a Ponzi scheme does not change our conclusion in this regard. Under the Uniform Fraudulent Transfer Act, the proper focus of our inquiry is on the value of the specific consideration given to the Debtor in the transaction at issue, not the impact that the investors' money had on the Debtor's overall business.

### Conclusion

Accordingly, the decisions of the Bankruptcy Court in all six adversary proceedings are AFFIRMED.

SO ORDERED.