COLORADO COURT OF APPEALS                                    2017COA13

Court of Appeals No. 13CA0239
City and County of Denver District Court No. 12CV1699
Honorable Edward D. Bronfin, Judge

_____

C. Randel Lewis, solely in his capacity as Receiver,

Plaintiff-Appellee and Cross-Appellant,

v.

Steve Taylor,

Defendant-Appellant and Cross-Appellee.

_____

JUDGMENT REVERSED, ORDER VACATED,
AND CASE REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE ASHBY
Freyre and Nieto*, JJ., concur

Announced February 9, 2017

_____

Lindquist & Vennum PLLP, Michael T. Gilbert, John C. Smiley, Theodore J. Hartl, Denver, Colorado, for Plaintiff-Appellee and Cross-Appellant

Podoll & Podoll, P.C., Richard B. Podoll, Robert A. Kitsmiller, Dustin J. Priebe, Greenwood Village, Colorado, for Defendant-Appellant and Cross-Appellee

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2016.

¶ 1     Following remand instructions from the supreme court, we are again presented with an issue of first impression in Colorado.  We must now decide whether the Colorado Uniform Fraudulent Transfer Act (CUFTA) requires an innocent investor who profited from his investment in a Ponzi scheme to return all funds in excess of his principal investment.  We conclude that such an innocent investor may be entitled to keep some of the funds exceeding the amount of his principal.

## I. Background

¶ 2     In 2006, defendant, Steve Taylor, invested three million dollars in a hedge fund run by Sean Mueller, a licensed securities broker.  During the period of his investment, Taylor received a series of payments from the fund.  Taylor withdrew all of his money in 2007, about one year after investing, and made a profit of over $487,000.

¶ 3     In 2010, the Colorado Securities Commissioner discovered that the hedge fund was a Ponzi scheme and Mueller was convicted of various criminal offenses.  The district court appointed plaintiff, C. Randel Lewis, as receiver to collect and distribute Mueller's assets to the creditors and investors he defrauded through the

1

Ponzi scheme.[1]  Lewis filed a claim under CUFTA seeking to void the transfer of the over $487,000 in net profits that Taylor received from Mueller's fund.

¶ 4     Both Lewis and Taylor moved the district court for summary judgment.  Taylor argued that (1) the CUFTA claim was filed outside the statutory time period and (2) even if the claim was timely, his net profits were not recoverable under CUFTA because he was an innocent investor.  Lewis argued that the claim was timely filed and that CUFTA required Taylor to return his net profits.  The district court agreed with Lewis on both issues and granted him summary judgment.

¶ 5     Taylor appealed.  A division of this court held that the district court erred by ruling that the claim was timely and reversed the district court's grant of summary judgment on that ground.  *Lewis v. Taylor*, 2014 COA 27M, ¶ 8.  Based on this conclusion, the division did not address whether CUFTA required Taylor to return his net profits.

_____

[1] A "Ponzi scheme" is a fraudulent investment scheme in which investors are paid from the principal amounts invested by later investors.

2

¶ 6    Lewis appealed the division's decision to our supreme court. The supreme court reversed the division's opinion, reinstated the district court's ruling that the CUFTA claim was timely, and remanded the case to this court to "consider the alternate argument on which [Taylor] appealed the trial court's order." *Lewis v. Taylor*, 2016 CO 48, ¶ 39. We therefore now address whether CUFTA requires Taylor to relinquish any amount of money exceeding his principal investment in the Ponzi scheme.

## II. CUFTA and Ponzi Schemes

¶ 7    Taylor argues that the district court erred by ruling that even though he was an innocent investor in Mueller's fund, CUFTA nevertheless required him to return all of the payments from the fund in excess of his principal investment. We review an order granting summary judgment de novo, applying the same legal principles as the district court. *See Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 290 (Colo. App. 2009).

¶ 8    Granting summary judgment is proper "when the pleadings and supporting documentation demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Credit Serv. Co., Inc. v. Dauwe*, 134

3

P.3d 444, 445 (Colo. App. 2005). We, like the district court, give the nonmoving party the benefit of all favorable inferences from the undisputed facts. *Id.*

¶ 9     The CUFTA provision under which Lewis brought his claim, section 38-8-105(1)(a), C.R.S. 2016, provides that "[a] transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." The parties do not dispute that (1) Mueller's fund was Taylor's debtor based on Taylor's three million dollar investment in the fund and (2) any transfers from the fund to Taylor were fraudulent under section 38-8-105(1)(a).

¶ 10     However, CUFTA also provides that "[a] transfer . . . is not voidable under section 38-8-105(1)(a) against a person who took in good faith and for a reasonably equivalent value." § 38-8-109(1), C.R.S. 2016. The parties agree that Taylor was an innocent investor in the fund and withdrew his principal and profits in good faith. They also agree that Taylor gave reasonably equivalent value for the return of his principal. But the parties disagree about whether Taylor gave reasonably equivalent value in exchange for his receipt of the approximately $487,000 in net profits.

4

## A. District Court Misapplied the Term "Reasonably Equivalent Value" in Section 38-8-109(1)

¶ 11    Taylor argues that the district court erred by ruling that, as a matter of law, he did not give reasonably equivalent value for transfers he received in amounts exceeding his principal investment. We agree.

¶ 12    The meaning of "reasonably equivalent value" is a question of statutory interpretation that we review de novo. *See Fischbach v. Holzberlein*, 215 P.3d 407, 409 (Colo. App. 2009). If the language of the statute is clear and unambiguous, we give effect to its plain and ordinary meaning. *See Fleury v. IntraWest Winter Park Operations Corp.*, 2014 COA 13, ¶ 7, *aff'd*, 2016 CO 41.

¶ 13    Whether a party has given reasonably equivalent value in exchange for a transfer is a mixed question of law and fact that requires a court to apply the proper definition of reasonably equivalent value to "all the facts and circumstances surrounding the transaction." *Schempp v. Lucre Mgmt. Grp., LLC*, 18 P.3d 762, 765 (Colo. App. 2000). Market value is not "wholly synonymous" with reasonably equivalent value, but it is an important factor for courts to consider. *Id.*

¶ 14    Although no Colorado appellate court has addressed this issue, courts in other jurisdictions that have enacted similar versions of the Uniform Fraudulent Transfer Act (UFTA) have done so. Among the courts that have addressed this issue, two lines of opinions have developed. One line holds, as a matter of law, that any payout of net profits by a Ponzi scheme operator to an investor can never be given in exchange for reasonably equivalent value. *See, e.g., Donell v. Kowell*, 533 F.3d 762, 777 (9th Cir. 2008). The other line rejects the idea that, based only on the fraudulent nature of the Ponzi scheme, any payout in excess of an innocent investor's principal is necessarily not given in exchange for reasonably equivalent value. *See, e.g., In re Carrozzella & Richardson*, 286 B.R. 480, 490-91 (D. Conn. 2002). Instead, these opinions require courts to focus on what was actually given and received in the specific transaction between the Ponzi scheme and the investor to determine whether the investor gave reasonably equivalent value for the net profits. *Id.*

¶ 15    Lewis, like the district court, relies on opinions from the first line of cases. We find that line of cases unpersuasive and now explain why.

¶ 16    In a widely cited case on which Lewis relies, the Ninth Circuit explained that the purpose of the reasonably equivalent value requirement in UFTA is to ensure that the only fraudulent transfer that is allowed to stand is one that does not deplete the assets of the Ponzi scheme and thereby hinder the scheme's ability to pay back innocent investors (creditors). *Donell*, 533 F.3d at 777. In the words of the Ninth Circuit, the "reasonably equivalent value" provision exists to "identify transfers made with no rational purpose except to avoid creditors." *Id.* Transfers that pay innocent investors a net profit are made to avoid creditors because "[p]ayouts of 'profits' made by Ponzi scheme operators are not payments of return on investment from an actual business venture. Rather, they are payments that deplete the assets of the scheme operator for the purpose of creating the appearance of a profitable business venture." *Id.*

¶ 17    But in a Ponzi scheme, all transfers to investors, whether they constitute net profits or repayment of principal, are made with the principal of later investors. Because all of these transfers "deplete the assets of the scheme operator for the purpose of creating the appearance of a profitable business venture," *id.*, none is supported

7

by reasonably equivalent value as defined by the Ninth Circuit. This is inconsistent with the Ninth Circuit's ultimate holding that transfers repaying principal are supported by reasonably equivalent value but transfers of net profits are not.

¶ 18 The Ninth Circuit attempted to mitigate this flaw in its analysis by explaining that the return of an innocent investor's principal is nevertheless given for reasonably equivalent value because such transfers "are settlements against the defrauded investor's restitution claim." *Id.* This rationale is also fraught with contradiction. If we consider the value of a defrauded investor's restitution claim, should we not also consider the amount of prejudgment interest to which the defrauded investor would be entitled? And would this not increase the amount of any such settlement so that the value of the settlement is greater than the principal investment? These practical issues aside, we conclude that it is improper in the first place, when determining what constitutes reasonably equivalent value under CUFTA, to consider a purely hypothetical restitution claim that an innocent investor might have brought and succeeded on had the investor not recovered the principal.

¶ 19    Other courts have reached the same conclusion as the Ninth Circuit by a different, but, in our view, equally questionable route. In another widely cited case on which Lewis relies, the Seventh Circuit in *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), employed an equitable and moral analysis that, we think, strays too far from the proper and limited inquiry of whether the innocent investor accepted the transfer for reasonably equivalent value. In *Scholes*, an innocent investor invested $2.5 million in, and netted almost $300,000 from, what was later discovered to be a Ponzi scheme. *Id.* at 755. The Seventh Circuit's task was to decide whether the Ponzi scheme's transfer of the net profits to the innocent investor violated Illinois' version of UFTA. *Id.* at 756. Like CUFTA, the Illinois statute provided that a transfer is fraudulent and voidable if the transferor makes it "without receiving a reasonably equivalent value in exchange." *Id.* (quoting 740 Ill. Comp. Stat. 160/5(a)(2) (1995)).[2]

---

[2] As we understand *Scholes*, the Seventh Circuit held that its reasoning applied equally to Illinois' pre-UFTA statute and Illinois' UFTA statute.

¶ 20    The Seventh Circuit began by considering the application of

the statutory provision in a moral context:

> unless a fair in the sense of equal (or at least
> approximately equal) exchange is insisted
> upon, loopholes are opened in the fraudulent
> conveyance statute that can only be described
> as immoral — a relevant consideration, when
> we consider the equitable origins of the
> concept of fraud.  We said that [innocent
> investor's] profit was supported by
> consideration.  But what was the source of the
> profit?  A theft by [the Ponzi scheme operator]
> from other investors.  What then is [the
> innocent investor's] moral claim to keep his
> profit?  None, even if the intent in paying him
> his profit was not fraudulent.

*Id.* at 757.  Purportedly returning to the statute it was applying, the

Seventh Circuit held that the innocent investor was

> entitled to his profit only if the payment of that
> profit to him, which reduced the net assets of
> the estate now administered by the receiver,
> was offset by an equivalent benefit to the
> estate.  It was not.  A profit is not offset by
> anything; it is the residuum of income that
> remains when costs are netted against
> revenues.  The paying out of profits to [the
> innocent investor was] not offset by further
> investments by him conferred no benefit on the
> corporations but merely depleted their
> resources faster.

*Id.* (citation omitted).  With that, the Seventh Circuit held that the innocent investor could keep his principal but not the net profit.  *Id.* at 757-58.

¶ 21     A significant problem with this analysis is that it ignores the fact that the value that an investor gives by investing is not limited to the precise dollar amount of the principal investment.  The value also includes the use of that money for however long it was available for investment or any other use.  Thus, the Seventh Circuit's analysis "ignore[s] the universally accepted fundamental commercial principal [sic] that, when you loan an entity money for a period of time in good faith, you have given value."  *Carrozzella & Richardson*, 286 B.R. at 489.

¶ 22     We recognize that in the context of a Ponzi scheme, the investors' principal is not invested as promised, and the time value of an innocent investor's principal does not increase the scheme's net worth.  But reasonably equivalent value "include[s] both direct and indirect benefits to the transferor, even if the benefit does not increase the transferor's net worth."  *Leverage Leasing Co. v. Smith*, 143 P.3d 1164, 1167 (Colo. App. 2006).  Regardless of whether a Ponzi scheme uses an innocent investor's money for proper or

11

fraudulent purposes, it nevertheless receives the benefit of the use of that money for a period of time. And the use of that money for a period of time has value. *See Carrozzella & Richardson*, 286 B.R. at 489.

¶ 23 In addition to the problems with *Donell* and *Scholes* identified above, we note one more which those opinions have failed to resolve. Under *Donell*, *Scholes*, and opinions like them, payments from a Ponzi scheme to trade creditors like landlords and utility companies for legitimately provided services would be subject to avoidance if those trade creditors profited at all from the transaction. These payments, just like the payment of net profits to innocent investors, are funded by the principal invested by other investors. This, coupled with the fact that they are made to perpetuate the Ponzi scheme, means that they are made with "actual intent to hinder, delay, or defraud any creditor" of the scheme and are therefore fraudulent. § 38-8-105(1)(a). And even if the trade creditors take the payments in good faith, under *Donell* and *Scholes*, any amount of that payment in excess of the utility company's or landlord's costs would not be for reasonably equivalent value under section 38-8-109(1). *See In re Unified*

*Commercial Capital, Inc.*, 260 B.R. 343, 352 (Bankr. W.D.N.Y. 2001); *see also Carrozzella & Richardson*, 286 B.R. at 490 (citing *Unified Commercial Capital*, 260 B.R. at 352).

¶ 24     Although we find the reasoning in the cases cited by Lewis flawed and unpersuasive, we nevertheless recognize that the courts that authored them, and the district court here, were motivated by the laudable goal of attempting to mitigate the harm to defrauded creditors in a fair and equitable manner.  But when applying a provision in a statute, it is our job to apply the plain and ordinary meaning of the words in the statute even when doing so may conflict with our own view of what is the most fair or equitable result.  We suspect that the flaws that we perceive in the analysis of the opinions discussed above emanate from an attempt to apply fraudulent conveyance statutes to circumstances for which they were not legislatively designed.  As the court stated in *Unified Commercial Capital*, 260 B.R. at 350,

> [b]y forcing the square peg facts of a "Ponzi" scheme into the round holes of the fraudulent conveyance statutes in order to accomplish a further reallocation and redistribution to implement a policy of equality of distribution in the name of equity, I believe that many courts have done a substantial injustice to

those statues and have made policy decisions
that should be made by Congress.

¶ 25    We are not the first court to have disagreed with the reasoning

of cases like *Donell* and *Scholes.*  The *Carrozzella & Richardson*

court, among others, did so too, and identified the fundamental flaw

in the reasoning of those cases: the improper focus on the overall

nature and propriety of the transferor's business rather than, as the

statute requires, whether the transferor received reasonably

equivalent value for the transfer.  *See Carrozzella & Richardson,*

286 B.R. at 488-89 ("The statutes and case law do not call for the

court to assess the impact of an alleged fraudulent transfer in a

debtor's overall business." (quoting *In re Churchill Mortg. Inv. Corp.,*

256 B.R. 664, 680 (Bankr. S.D.N.Y. 2000))).  As the *Carrozzella &*

*Richardson* court explained, the reasonably equivalent value

provision in UFTA, which is identical to that in CUFTA, requires "an

evaluation of the specific consideration exchanged by the

[transferor] and the transferee in the specific transaction which the

[receiver] seeks to avoid, and if the transfer is equivalent in value, it

is not subject to avoidance under the law."  *Id.* at 489 (quoting

*Churchill,* 256 B.R. at 680).  We agree with the *Carrozzella &*

14

*Richardson* court that we cannot read a Ponzi scheme exception into CUFTA that would allow us to examine the propriety of the transferor's business when determining whether a transferee gave reasonably equivalent value for a transfer.

¶ 26     Ultimately, no matter how tempting, we may not look beyond the plain language of the statute to decide which transfers from a Ponzi scheme are voidable and which are not. The General Assembly may wish to revisit this issue and craft a different statute that it determines more fairly addresses these circumstances. Perhaps it should, especially given that courts have engaged in such unconvincing analytical gymnastics to effect equitable remedies by way of fraudulent transfer statutes. If it does craft a new statute, the General Assembly may wish to consider the arguments advanced by cases like *Scholes,* or equitable principles embodied in doctrines such as the clean hands doctrine. *See Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 519 (Colo. App. 2006) ("[A] party engaging in improper or fraudulent conduct relating in some significant way to the subject matter of the cause of action may be ineligible for equitable relief."). But it is not our place to apply such equitable principles in circumstances where, as

here, there is an unambiguous statute to apply. Instead, we must apply the plain language that the General Assembly chose in enacting CUFTA. And section 38-8-109(1), like the rest of CUFTA, addresses the propriety of a transfer, not the propriety of the transferor's overall business. Accordingly, any evaluation of what constitutes reasonably equivalent value in this case must address what was actually exchanged, not how the hedge fund fraudulently used whatever it received in the exchange. This evaluation cannot ignore the fact that there is value in the use of money for a period of time.

¶ 27 We therefore conclude that the district court erred by not accounting for the time value of Taylor's principal investment when determining whether he gave reasonably equivalent value under section 38-8-109(1) for transfers he received from Mueller's fund.

## B. Remand is Necessary

¶ 28 We would normally prefer to give the trial court more specific guidance on remand. And, under different circumstances, we might have been able to properly apply section 38-8-109(1) ourselves to determine which transfers are voidable and which are not. But whether "reasonably equivalent value" has been given is a question

16

of fact. *See In re Zeigler*, 320 B.R. 362, 374 (Bankr. N.D. Ill. 2005). And because the district court did not make findings about any individual transfers, we cannot do so and must remand for the district court to make additional findings.

¶ 29 Section 38-8-109(1) is unambiguous in describing circumstances under which "a transfer" is voidable. The plain and ordinary meaning of this section therefore requires courts to decide whether *individual transfers* are voidable. *See Fleury*, ¶ 7 (when interpreting a statute that is clear and unambiguous, we give effect to its plain and ordinary meaning).

¶ 30 The district court's findings of undisputed material facts suggested that there were individual transfers, but did not identify any of them. The district court found that "[b]etween September 1, 2006 and April 19, 2007, a total of $3,487,305.29 was paid out to Mr. Taylor from the Mueller Funds (the Ponzi scheme). This represents a return of all $3 million in principal he invested, plus an additional profit of $487,305.29 ('Net Profit')." We presume from this finding that (1) Taylor received a series of transfers from Mueller's fund and (2) the district court aggregated the value of these unidentified individual transfers and then determined that

17

the portion of the aggregate Taylor received that exceeded his principal investment was not, as a matter of law, supported by reasonably equivalent value.

¶ 31    This analysis violates the plain language of section 38-8-109(1) requiring courts to evaluate whether "[a] transfer" is voidable, not whether portions of the aggregate of several transfers are voidable. And because the district court's factual findings do not identify the individual transfers, we are unable apply section 38-8-109(1) ourselves.

¶ 32    We must therefore remand the case to the district court to make additional findings about the individual transfers Taylor received from Mueller's fund and to consider whether Taylor received the transfers for reasonably equivalent value.

### III. Other Issues

¶ 33    Because we reverse the district court's order granting summary judgment, we vacate the court's order awarding costs and interest to Lewis.  But because the supreme court's remand order directed us only to "consider the alternate argument on which [Taylor] appealed the trial court's order," *Lewis*, 2016 CO 48, ¶ 39, we do not address Taylor's argument that the district court erred by

18

dismissing his counterclaim for rescission of the investment contract with Mueller. We nevertheless note that even if the supreme court's remand order allowed us to consider this argument, we could not because the investment contract is not part of the record on appeal.

## IV. Conclusion

¶ 34 The district court's order granting Lewis summary judgment is reversed and the case is remanded to the district court with directions to determine whether Taylor received any individual transfers for reasonably equivalent value as that term is explained in this opinion. Based on that determination, the district court should rule on both Taylor's and Lewis' motions for summary judgment and conduct further proceedings as it deems appropriate.

JUDGE FREYRE and JUDGE NIETO concur.