Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2018 CO 76**

**No. 17SC241, Lewis v. Taylor—Uniform Fraudulent Transfer Act—Ponzi Schemes—
Reasonably Equivalent Value.**

The supreme court holds that under the Colorado Uniform Fraudulent Transfer
Act ("CUFTA"), an innocent investor who profits from his investment in an equity-type
Ponzi scheme, lacking any right to a return on investment, does not provide reasonably
equivalent value based simply on the time value of his investment. In this case, an
investor unwittingly invested in a Ponzi scheme. Before the scheme's collapse, he
withdrew his entire investment, plus a profit. A court-appointed receiver sued to claw
back the investor's profits under CUFTA section 38-8-105(1)(a), C.R.S. (2018), which
provides that a "transfer made . . . by a debtor is fraudulent as to a creditor . . . if the
debtor made the transfer . . . [w]ith actual intent to hinder, delay, or defraud any
creditor of the debtor." The investor raised an affirmative defense, § 38-8-109(1), C.R.S.
(2018), contending he could keep his profit because he "took in good faith and for a
reasonably equivalent value." Because the time value of money is not a source of
"value" under CUFTA and equity investors have no guarantee of any return on their
investments, the supreme court concludes that the investor did not provide "reasonably

equivalent value" in exchange for his profit. Accordingly, the supreme court reverses

the judgment of the court of appeals.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203

**2018 CO 76**

**Supreme Court Case No. 17SC241**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 13CA239

**Petitioner:**

C. Randel Lewis, solely in his capacity as receiver,

v.

**Respondent:**

Steve Taylor.

**Judgment Reversed**
*en banc*
September 17, 2018

**Attorneys for Petitioner:**
Gilbert Law Office, LLC
Michael T. Gilbert
        *Denver, Colorado*

**Attorneys for Respondent:**
Podoll & Podoll, P.C.
Richard B. Podoll
Robert A. Kitsmiller
        *Greenwood Village, Colorado*

Foley & Mansfield, PLLP
Dustin J. Priebe
        *Englewood, Colorado*

**Attorneys for Amici Curiae Gerald Rome, Securities Commissioner for the State of Colorado, and the North American Securities Administrators Association:**
Cynthia H. Coffman, Attorney General
Russell B. Klein, Deputy Attorney General
Charles J. Kooyman, Assistant Attorney General
      *Denver, Colorado*

**JUSTICE HOOD** delivered the Opinion of the Court.
**JUSTICE HART** dissents.

¶1    Steve Taylor unwittingly invested millions of dollars in what proved to be a massive Ponzi scheme.  Under the scheme, investors such as Taylor provided equity to various ostensibly legitimate investment companies.  Those investors could withdraw the profits (if any) from their investments, but there was no guaranteed return.  Before the scheme's collapse, Taylor fortuitously withdrew his entire investment, plus nearly half a million dollars in profit.  Other, less-fortunate investors failed to escape in time and bore the brunt of the collapse; they eventually lost millions.

¶2    After the Ponzi scheme's collapse, a court-appointed receiver brought what is commonly referred to as an "actual fraud" claim under the Colorado Uniform Fraudulent Transfer Act ("CUFTA") section 38-8-105(1)(a), C.R.S. (2018), to claw back Taylor's profits.  As an innocent investor, Taylor argued he should be allowed to keep the money, contending (in the words of a statutory affirmative defense) that he provided "reasonably equivalent value" in exchange for his profits.  A division of the court of appeals concluded that Taylor was not precluded as a matter of law from keeping some of the profit, because he may have provided reasonably equivalent value in the form of the time value of his investment.  The receiver appealed.

¶3    In this opinion, we consider whether Taylor may keep profit exceeding his initial investment based on the time value of money.  We hold that he may not: Under CUFTA, an innocent investor who profited from his investment in an equity-type Ponzi scheme, lacking any right to a return on investment, does not provide reasonably equivalent value based simply on the time value of his investment.  Therefore, we

3

reverse the division's judgment and remand for further proceedings consistent with this opinion.

## I. Facts and Procedural History[1]

¶4 Respondent Steve Taylor invested $3 million in several investment companies run by Sean Mueller (the "Mueller Funds"). Within thirteen months, Taylor had withdrawn his entire investment, along with $487,305.29 in profit. The Mueller Funds were later exposed as nothing more than a multi-million dollar Ponzi scheme. Even before Taylor invested, the Mueller Funds were already insolvent. They continued to diminish in value throughout Taylor's investment period. Mueller used Taylor's $3 million primarily to fund other investors' withdrawals, including some of Taylor's own withdrawals. And most of Taylor's withdrawals were funded by new contributions from other investors.

¶5 Though Taylor was fortunate to have withdrawn his full investment plus a profit before things went south, other investors weren't nearly so lucky. About ninety-five investors lost a total of approximately $72 million in the Mueller Funds after the scheme collapsed. Following that collapse, the trial court appointed the petitioner, C. Randel Lewis, as receiver ("the Receiver") for the Mueller Funds to collect and distribute assets among the losing investors.

---

[1] This is the second time this case has come before us. See Lewis v. Taylor, 2016 CO 48, 375 P.3d 1205 (holding that CUFTA's time limitations provision may be tolled by express agreement). The issue we resolved in that opinion, however, is irrelevant to the one we confront here. So, we discuss only the facts and procedural history relevant to the issue we address in this opinion.

¶6 The Receiver sued under CUFTA section 38-8-105(1)(a) to recover Taylor's nearly $500,000 profit from the scheme. Taylor asserted an affirmative defense under CUFTA, arguing he should be able to keep his profits because (1) he was an innocent investor who didn't know the Mueller Funds were a Ponzi scheme, and (2) he provided "reasonably equivalent value" in exchange for his profits. The Receiver contended that, as a matter of law, Taylor must disgorge his profits and was entitled to keep only the $3 million representing his initial investment. The parties cross-filed motions for summary judgment. The trial court granted summary judgment in the Receiver's favor, concluding Taylor did not provide reasonably equivalent value in exchange for his profits as a matter of law.

¶7 Taylor appealed and a division of the court of appeals reversed. Lewis v. Taylor, 2017 COA 13, ¶ 34, __ P.3d __. Observing that this was an issue of first impression in Colorado on which other jurisdictions were split, id. at ¶ 14, the division concluded the trial court erred by not considering the time value of Taylor's $3 million investment when determining whether he provided reasonably equivalent value in exchange for his profits. Id. at ¶ 27. It reasoned the case should be remanded for further factual findings to determine whether Taylor provided reasonably equivalent value—in the form of the time value of his initial investment—in exchange for each transfer of money he received from the Mueller Funds. Id. at ¶¶ 28–32.

5

¶8 The Receiver petitioned this court to review the division's judgment, and we granted his petition.[2]

## II. Standard of Review

¶9 This case requires us to review a trial court's order granting summary judgment and questions of statutory interpretation, both of which we review de novo. Front Range Res., LLC v. Colo. Ground Water Comm'n, 2018 CO 25, ¶ 15, 415 P.3d 807, 810 (summary judgment); State Farm Mut. Auto Ins. Co. v. Fisher, 2018 CO 39, ¶ 12, 418 P.3d 501, 504 (statutory interpretation).

## III. Analysis

¶10 We begin with a brief overview of common Ponzi schemes. Then, we discuss the CUFTA framework at issue here, highlighting the affirmative defense pertaining to transfers made in good faith and for reasonably equivalent value. Finally, we turn to the sole issue this case presents: Whether Taylor provided reasonably equivalent value in exchange for the profits he received. We focus on how the legislature has defined the term "value" and consider whether that definition encompasses the time value of an equity investor's money. While we conclude the language of the statute does not include the time value of money on an investment that an equity investor knew could

---

[2] We granted certiorari to review the following reframed issue:

> Whether, as a matter of first impression in Colorado, the court of appeals erred by holding that Colorado's Uniform Fraudulent Transfer Act permits an innocent investor who profited from his investment in a Ponzi scheme to keep some of the profit based on the time value of money as "reasonably equivalent value" for the profit.

be lost entirely, we nonetheless examine the split in caselaw on which the parties aimed their attention. In surveying that caselaw, we see an important distinction between cases in which an investor had a contractual right to a return on investment and those in which, as here, the investor had none. We see nothing in the extra-jurisdictional caselaw that militates against the conclusion we reach based on Colorado's statutory scheme: An equity investor in a Ponzi scheme, lacking any right to a return on investment, is not entitled to keep profits based simply on the time value of money.

## A. Ponzi Schemes

¶11 Generally speaking, a Ponzi scheme is a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments." Ponzi Scheme, Black's Law Dictionary (10th ed. 2014).

¶12 But not all Ponzi schemes take the same form. See Finn v. All. Bank, 860 N.W.2d 638, 652 (Minn. 2015) (noting in many Ponzi schemes "there is no legitimate source of earnings," but that "not every Ponzi scheme lacks a legitimate source of earnings"). For instance, one common type of Ponzi scheme involves the Ponzi schemer entering into a contract with an individual investor, under which the schemer promises to repay the investor's principal with interest payments. See Spencer A. Winters, The Law of Ponzi Payouts, 111 Mich. L. Rev. 119, 137 (2012) (describing different types of Ponzi schemes). This scheme is commonly called a fixed-income Ponzi scheme. See id. at 123. By contrast, in an equity-type Ponzi scheme, the Ponzi schemer does not promise any rate

of return.  Id. at 137.  Instead, the Ponzi schemer acts as an investment company, promising to invest the funds and pay out the earnings — if any — that accrue.  Id.

¶13    The Mueller Funds were an equity-type Ponzi scheme.  The Receiver contends that this fact is crucial to understanding why Taylor must disgorge his profit: If Taylor wasn't entitled to any return on his investment, the argument goes, then he did not provide reasonably equivalent value in the form of the time value of his investment.  In response, Taylor does not dispute that the Mueller Funds were an equity-type Ponzi scheme.  He counters that the type of Ponzi scheme does not matter under CUFTA.  CUFTA, he asserts, simply seeks to keep debtors from placing assets beyond the reach of creditors, rather than offering courts an opportunity to usurp the role of the legislature by seeking to impose equity among winning and losing investors after a Ponzi scheme collapses.

¶14    In evaluating these competing assertions, we turn first to the language of CUFTA.

## B. CUFTA Framework

¶15    The Receiver sued Taylor under CUFTA section 38-8-105(1)(a), which provides that a "transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor."  Thus, a transfer made by the Mueller Funds was fraudulent as to Taylor if the Mueller Funds made the transfer with the intent to defraud the losing investors.  But CUFTA section 38-8-109(1), C.R.S. (2018), also contains an affirmative defense, providing that a "transfer . . . is not voidable under section 38-8-105(1)(a) against a

8

person who took in good faith and <u>for a reasonably equivalent value</u>" (emphasis added).

¶16     Here, the parties don't dispute that the transfers from the Mueller Funds to Taylor were fraudulent under section 38-8-105(1)(a) or that Taylor was an innocent investor who withdrew his investment and profits in good faith under section 38-8-109(1).  Rather, the parties dispute only the second prong of CUFTA's affirmative defense—that is, whether Taylor gave reasonably equivalent value in exchange for his approximately $500,000 profit.

¶17     With this framework in mind, we address that issue below.

### C. The Time Value of Money Does Not Constitute Reasonably Equivalent Value in an Equity-Type Ponzi Scheme

¶18     The Receiver contends that the division erred by concluding Taylor may have provided reasonably equivalent value in exchange for his false profits because of the time value of his investment in the scheme.  Taylor disagrees.  Thus, our answer depends on how we interpret "reasonably equivalent value" under CUFTA.

¶19     "In construing a statute, we seek to give effect to the General Assembly's intent by according words and phrases their plain and ordinary meanings."  <u>Fisher</u>, ¶ 12, 418 P.3d at 504.  If the statutory language is clear and unambiguous, we apply it as written and need not resort to interpretive rules of statutory construction.  <u>Id.</u>

¶20     The phrase "reasonably equivalent value" is not defined in CUFTA, but "value" is.  Section 38-8-104(1), C.R.S. (2018), provides, "<u>Value</u> is given for a transfer . . . if . . .

property is transferred or an antecedent debt is secured or satisfied . . . ." (emphases added). And CUFTA further defines the terms used to define "value" as follows:

- "Property means anything that may be the subject of ownership."
§ 38-8-102(11), C.R.S. (2018) (emphasis added and internal quotation marks omitted).

- "Debt means liability on a claim." § 38-8-102(6) (emphasis added and internal quotation marks omitted).

- "Claim means a right to payment, whether or not the right is reduced to judgment . . . ." § 38-8-102(3) (emphasis added and internal quotation marks omitted).

¶21 Based on these provisions, equity investors do not provide any "value" in exchange for profits they receive exceeding the amount of their investment. First, we note that the statutory scheme does not identify the time value of money as a source of value. Had the legislature wanted to make the affirmative defense sweep so broadly, it could have done so explicitly. Yet, it did not. Second, equity investors have no guarantee of any return—even for the time value of their investments. It follows, then, that when an equity investor withdraws more money than he invested, he has not provided any "value," as CUFTA defines it, in exchange for his profit. In these circumstances, he provides no property that actually yields any true profit. And in paying the investor more than he invested, the Ponzi schemer doesn't satisfy an antecedent debt or a claim that the investor has because the investor has no right to any return on investment. Thus, CUFTA does not define "value" to include the time value of money.

10

¶22 Accordingly, CUFTA's plain language resolves this question in the Receiver's favor—that is, Taylor did not provide "reasonably equivalent value" in exchange for the profit he received.[3] But, in observing that this is an issue of first impression in Colorado, the parties focus much of their analysis (as did the division) on how other jurisdictions have grappled with whether innocent investors who profit from Ponzi schemes provide reasonably equivalent value under similar versions of the Uniform Fraudulent Transfer Act ("UFTA"). We join them in examining these cases to see if their reasoning compels a result at odds with our reading of Colorado's statutory scheme.

¶23 The Receiver points to cases providing "the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers." E.g., Donell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008). This is the majority view in the

---

[3] In his briefing and at oral argument, Taylor asserted that a claim under CUFTA was the wrong one for the Receiver to have brought. He doubled down on the argument that CUFTA isn't concerned with equality among creditors, but is instead designed to ensure that a debtor doesn't put assets beyond the reach of creditors. Thus, the proper resolution, he stressed, should come from the General Assembly—not us. But Taylor does not dispute that any transfers from the Mueller Funds to Taylor were fraudulent under section 38-8-105(1)(a)—i.e., the CUFTA claim that the Receiver brought. The division noted as much in its opinion, Lewis v. Taylor, 2017 COA 13, ¶ 9 ("The parties do not dispute that . . . any transfers from the fund to Taylor were fraudulent under section 38–8–105(1)(a)."). And in his motions on summary judgment in the trial court, Taylor argued only that he was an innocent investor who provided reasonably equivalent value and, thus, was entitled to keep his profit under CUFTA section 38-8-109(1). Therefore, we reject Taylor's argument that a claim under CUFTA was the wrong one for the Receiver to have brought.

federal courts. See Janvey v. Brown, 767 F.3d 430, 441–42 (5th Cir. 2014); Perkins v. Haines, 661 F.3d 623, 627 (11th Cir. 2011); In re Hedged-Invs. Assocs., Inc., 84 F.3d 1286, 1290 (10th Cir. 1996); Scholes v. Lehmann, 56 F.3d 750, 757–59 (7th Cir. 1995). The rationale for this view is that innocent Ponzi-scheme investors don't provide "reasonably equivalent value" for the net profit they receive because the profit isn't from an actual business venture—rather, payments exceeding an investor's principal merely further the scheme by depleting the debtor's assets under the guise of a profitable business. See, e.g., Donell, 533 F.3d at 777. But this approach also allows innocent investors to keep their investment, reasoning that return of the investor's investment is for "value," (under UFTA's definition) as payment of "an antecedent debt": the claim for restitution or fraud that the investor would have against the debtor. Id. at 777–78; Brown, 767 F.3d at 443.

¶24 Taylor argues those cases were wrongly decided and instead encourages us to adopt the view of another line of cases, focusing on the discrete transactions between the debtor and transferee to decide whether the parties exchanged each payment for a reasonably equivalent value. See, e.g., In re Carrozzella & Richardson, 286 B.R. 480, 488–90 (D. Conn. 2002); In re Unified Commercial Capital, Inc., 260 B.R. 343, 351 (Bankr. W.D.N.Y. 2001). These cases cite the narrow language in UFTA statutes that refer to "A transfer" as not being void "against a person who took in good faith and for a reasonably equivalent value," § 38-8-109(1) (emphasis added), to reason that this determination shouldn't focus on whether the debtor was running a Ponzi scheme— unlike the cases on the other side of the split—but rather whether the innocent investor

12

provided reasonably equivalent value for each transfer he received from the debtor. See, e.g., Carrozzella, 286 B.R. at 488. That is the approach the division adopted here. Lewis v. Taylor, 2017 COA 13, ¶¶ 26–27.

¶25 The cases on which the division relied, however, pertain to a situation different from the one at issue here. In those cases, the debtor (i.e., the Ponzi schemer) contracted with individuals, promising to eventually repay their principal investment, plus interest. See Carrozzella, 286 B.R. at 483–84 (involving a scheme promising between eight and twelve percent interest on investment); Unified Commercial Capital, 260 B.R. at 346–47 (promising twelve percent interest on investment). And the contractual right to interest on investment creates a time value to money constituting reasonably equivalent value under the statute. See Carrozzella, 286 B.R. at 491 ("In exchange for the interest paid to the [investors], the Debtor received a dollar-for-dollar forgiveness of a contractual debt. This satisfaction of an antecedent debt is 'value,' . . . and in this case 'reasonably equivalent value.'"); Unified Commercial Capital, 260 B.R. at 351 (noting that holding otherwise would ignore "the universally accepted fundamental commercial principal [sic] that, when you loan an entity money for a period of time in good faith, you have given value and are entitled to a reasonable return").

¶26 A contractual right to interest was critical to the holding in the cases concluding that the investors provided reasonably equivalent value. See Carrozzella, 286 B.R. at 490–91 ("Had the insolvent Debtor simply given away money without an extinguishment of an underlying debt, the situation would be different."); cf. In re Unified Commercial Capital, 2002 WL 32500567, *8 (W.D.N.Y. June 21, 2002), aff'g 260

13

B.R. 343 ("If a person invests money with the understanding that he will share in the profits produced by his investment, and it turns out that there are no profits, it is difficult to see how that person can make a claim to receive any more than the return of his principal investment. The false representation by the Ponzi schemer that he is paying the investor his share of the profits, which are in fact nothing more than funds invested by other victims, cannot alter the fact that there are no profits to share.").

¶27 Here, Taylor had no contractual right to interest. In fact, he had no right to <u>any</u> profit. Instead, Mueller acted as an investor and agreed to pay out only the earnings that accrued—if any—from Taylor's investment. It's clear, then, that there was no "time value" to Taylor's investment, because he wasn't guaranteed any return on his investment. Simply put, Taylor didn't provide reasonably equivalent value in exchange for his false profits because he wasn't entitled to receive <u>anything</u> from his investment. Thus, the cases relied upon by Taylor and the division are inapposite.

¶28 The division reasoned (and Taylor argues) that rejecting the view of the cases on which it relied would require trade creditors to disgorge any amount they received above their own cost of providing goods or services. <u>Lewis v. Taylor</u>, 2017 COA 13, ¶ 23. We need not resolve such a question because this case involves an equity investor, not a trade creditor. Even so, the division's reasoning overlooks the "antecedent debt" that a trade creditor exchanges in return for payment of the goods and services from the Ponzi schemer.

¶29 Still, Taylor argues that CUFTA "intrinsically acknowledges the time value of money." Again, we disagree. Innocent investors in Ponzi schemes involving a

14

contractual right to interest payments in addition to the return of the principal investment might arguably provide reasonably equivalent value, as the Carrozzella court recognized, in the form of "a dollar-for-dollar forgiveness of a contractual debt."[4] 286 B.R. at 491 (emphasis added). But in an equity-type Ponzi scheme, the innocent investor who profits can point to nothing that ties his false profit to "value" that he provided the debtor under CUFTA's provisions defining that term. The question isn't whether there is time value to money generally—it's whether CUFTA recognizes that concept in its provisions defining "value." And (as applied to an equity-type Ponzi scheme) it does not.

## D. Application

¶30 Because CUFTA does not identify the time value of money as a source of value, and because Taylor was an equity investor to whom no return was guaranteed, Taylor

---

[4] The Receiver argues that such contracts are void against public policy because "any award of [interest] damages would have to be paid out of money rightfully belonging to other victims of the Ponzi scheme." See Brown, 767 F.3d at 441–42 (internal citation and quotation marks omitted). Because the Ponzi scheme at issue in this case does not involve a contractual right to interest, we do not decide whether an innocent investor in that type of Ponzi scheme would be entitled to keep any money exceeding his investment. We discuss Carrozzella, 286 B.R. at 491, and Unified Commercial Capital, 260 B.R. at 351, merely to illustrate why Taylor's reliance on the reasoning in those cases is misplaced. Similarly, Taylor contends we should reject "the Ponzi-scheme presumption," which, he argues, holds that any payments of profit by a Ponzi schemer to an investor are not for reasonably equivalent value. Taylor points to a trio of other state supreme court opinions that he contends properly reject such a presumption. See Janvey v. Golf Channel, Inc., 487 S.W.3d 560 (Tex. 2016); Finn v. All. Bank, 860 N.W.2d 638 (Minn. 2015); Okla. Dep't of Sec. v. Blair, 231 P.3d 645 (Okla. 2010). The Receiver argues those cases are distinguishable. Regardless, we have simply interpreted CUFTA's plain language to answer the question on which we granted certiorari. Thus, we do not express any opinion on the so-called Ponzi-scheme presumption.

cannot demonstrate that he provided reasonably equivalent value in exchange for his false profits. Therefore, he is not entitled to keep the profits on his investment.

¶31 Though we ultimately conclude Taylor may not keep his profits, we note that our reading of "value" under CUFTA entitles him to keep the $3 million representing his initial investment.[5] In short, as other courts have recognized, Taylor provided "value" for the return of his $3 million investment as the payment of "an antecedent debt"—namely, the claim for restitution or fraud he would have had against the Mueller Funds. See, e.g., Donell, 533 F.3d at 777–78.

## IV. Conclusion

¶32 We hold that under CUFTA, an innocent investor who profits from his investment in an equity-type Ponzi scheme, lacking any right to a return on investment, does not provide reasonably equivalent value based simply on the time value of his investment. Because the division incorrectly concluded that Taylor may be entitled to

---

[5] In concluding the opposite, the division below observed that allowing investors to keep the amount of their initial investment under this rationale was "fraught with contradiction," because a defrauded investor would also be entitled to prejudgment interest on his restitution claim (thus, being entitled to an amount exceeding his initial investment) and, regardless, it would be improper "to consider a purely hypothetical restitution claim" under CUFTA. Lewis v. Taylor, 2017 COA 13, ¶ 18. But CUFTA explicitly defines claim as "a right to payment, whether or not the right is reduced to judgment . . . ." § 38-8-102(3) (emphasis added). Plus, Taylor doesn't have a right to prejudgment interest because he received his $3 million initial investment back and nearly $500,000 in profit. See Bedard v. Martin, 100 P.3d 584, 589 (Colo. App. 2004) (concluding that where plaintiff accepted payment "representing the full purchase price of the property, he lost his right to recover prejudgment interest").

keep some of his profits due to the time value of his investment, we reverse its judgment and remand for further proceedings consistent with this opinion.

**JUSTICE HART** dissents.

JUSTICE HART, dissenting.

¶33 Ponzi schemes are tragedies, and, here, the Receiver's interest in being able to take some of Taylor's "false profits" to cover losses of others who invested in the Mueller Funds is understandable. One can certainly debate the equities of such an effort at redistribution of losses amongst innocent parties. But the Colorado Uniform Fraudulent Transfer Act ("CUFTA" or the "Act") cannot be used to effectuate this laudable goal. I respectfully dissent.

¶34 The majority makes two interrelated errors. First, like the district court, the majority appears to consider not the individual transfers made from the Mueller Funds to Taylor, but the investment scheme as a whole, and the total amount ultimately paid out to Taylor. CUFTA requires consideration of each individual transfer. Second, the majority assumes that because Taylor was an equity investor, he had no "claim" to payments made in excess of his principal.

¶35 By its plain language, CUFTA requires analysis of each individual transfer to evaluate 1) whether it was fraudulent as defined by section 38-8-105, C.R.S. (2018) and 2) whether the affirmative defense established by section 38-8-109(1), C.R.S. (2018) applies. In both of those sections of the law, and indeed throughout the Act, the words direct our attention to the question of whether "a transfer" can be challenged under CUFTA. This language requires assessment of individual transfers—not a package of transfers.

¶36 The only other state supreme courts to consider this question have reached the same conclusion. See Oklahoma Dept. of Sec. ex rel. Faught v. Blair, 231 P.3d 645 (Okla.

1

2010); <u>Finn v. Alliance Bank</u>, 860 N.W.2d 638 (Minn. 2015); <u>Janvey v. Golf Channel, Inc.</u>, 487 S.W.3d 560 (Tex. 2016).  As the Texas Supreme Court recognized in considering how the Texas Uniform Fraudulent Transfer Act should apply in the context of a Ponzi scheme, "[v]alue must be determined objectively at the time of the transfer and in relation to the individual exchange at hand rather than viewed in the context of the debtor's entire enterprise, viewed subjectively from the debtor's perspective, or based on a retrospective evaluation."  <u>See</u> <u>Janvey</u>, 487 S.W.3d at 582.  The Minnesota Supreme Court similarly recognized, in interpreting that state's version of CUFTA, that "the focus of the statute is on individual transfers, rather than a pattern of transactions that are part of a greater 'scheme.'"  <u>Finn v. Alliance Bank</u>, 860 N.W.2d at 647.

¶37     As the court of appeals noted below, the district court's findings indicate that there were multiple individual transfers made from the Mueller Funds to Taylor between September 1, 2006, and April 19, 2007.  The district court made no findings as to any of the individual transfers, and the investment agreement Taylor entered into with Mueller is not part of the record.[6]  As a result, there was no way for the court of

---

[6] The fact that such an agreement exists does not appear to be in dispute. <u>See</u> Taylor's Op. Br. at pp.22–23, <u>Lewis v. Taylor</u>, No. 13CA239 (Jun. 20, 2013).  According to Taylor, he had a contractual right to make withdrawals upon demand at any time, "up to the value of his investment account."  <u>Id.</u> at p.23.  Thus, Taylor's argument that the payments he received from the Mueller Funds were made pursuant to the parties' contract is, on its face, plausible.

2

appeals to determine (and no way for us to determine) whether any of the individual transfers were for "reasonably equivalent value."

¶38 Reasonably equivalent value is a factual determination that Taylor is entitled to have made as to each individual transfer. I agree with the majority that considering the time value of money standing alone is not the correct way to evaluate whether each of Taylor's withdrawals was for reasonably equivalent value. Instead, at a minimum, the trial court must consider the terms of Taylor's investment agreement to determine whether each individual transfer made to him was for reasonably equivalent value.[7] Some of the transfers may have been for reasonably equivalent value; others may not have. But each transfer should have been considered on its own, as CUFTA requires.

¶39 Additionally, the mere fact that Mueller's Ponzi scheme was disguised as an equity investment vehicle (rather than, say, a loan participation agreement involving investor contracts specifying a rate of interest payable in periodic installments) does not mean that Taylor had no "claim" to a return on his investment as the majority suggests. In reaching that conclusion, the majority ignores the undisputed fact that Taylor had rights under an investment agreement. While, as the majority points out, Taylor did not have a right to a specified interest rate, he did apparently have the right to withdraw

---

[7] The then-existing market conditions, the time value of money of Taylor's principal, and his lost opportunity costs might also be part of this evaluation as each is relevant to a determination of reasonable equivalence. In other words, were the payments to Taylor in excess of what he could reasonably expect to have received from an investment vehicle of the variety he thought he had selected.

3

either principal or interest at any time from the funds contained in his investment account. See fn. 1, supra. Taylor exercised those rights. It may be true that until the moment he exercised his right to withdraw either his principal or any supposed profit on that principal, he did not have any claim to those funds. But each time he requested a withdrawal from the Mueller Funds, Taylor established a claim to the amount requested. And each time one of the Mueller Funds paid out on a claim for such funds, it satisfied an antecedent debt pursuant to the investment agreement Taylor entered into when he deposited $3 million with Mueller.

¶40 The fact that a Ponzi scheme does not generate true profit from an investor's deposited capital should be irrelevant to the determination of reasonably equivalent value. An assessment of whether a transfer was made for reasonably equivalent value under CUFTA should not be dependent upon the concealed intent of a transferor. Rather—like section -109's requirement of good faith—reasonably equivalent value is a separately calculable factor that should be analyzed exclusively from the vantage point of the innocent transferee. See Janvey, 487 S.W.3d at 582 ("Whether a debtor obtained reasonably equivalent value in a particular transaction is determined from a reasonable creditor's perspective at the time of the exchange . . . without the wisdom hindsight often brings.")

¶41 Consequently, an investor who unwittingly received false profits should not be divested of such amounts unless the principal he or she deposited could not have plausibly generated such a return had it been managed in accordance with the parties' investment agreement. To hold otherwise deprives transferees of a section -109(1)

4

defense based on the transferor's concealed conduct alone and ignores the provision's purpose, namely, to provide a complete defense to the innocent recipient of a fraudulent transfer. The consequence of the majority's approach is that no innocent investor in a Ponzi scheme would ever be entitled to assert a section -109(1) affirmative defense. Nothing in CUFTA suggests that result.

¶42 To return briefly to the equities, the majority notes that none of the Mueller Funds' investors had a right to return of their principal or a guarantee of profit. As noted here, that was true until the moment any one of the investors exercised a withdrawal right under his or her investment agreement. In the equity investment context, one set of innocent investors should not be divested of funds (principal or profit) already disbursed in order to benefit other persons who took on the very same risk but unfortunately did not exercise the same withdrawal rights before the Ponzi scheme collapsed. As harsh as it may appear to leave investors who did not cash out their investment accounts, as Taylor did, with less than they believe they are due, permitting a receiver to obtain judgments against those who withdrew and disposed of funds they believed they were rightfully entitled to is equally unfair. It is also unwise as it undermines the finality of investment transactions, which, in turn, will discourage market participation.

¶43 For these reasons, I respectfully dissent.